**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**UNIVERSAL TRADE AND INDUS-
TRIES, INC., doing business as Univer-
sal Medical Laboratories, and Ferey-
doun Karimi, Defendants-Appellants.**

**Nos. 81–1592, 81–1653.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1982.

Decided Jan. 4, 1983.

John J. Resich, Jr., San Pedro, Cal., for Universal Trade and Industries, Inc.

Michael D. Abzug, Los Angeles, Cal., for Karimi.

Robert Pallemon, Asst. U.S. Atty., Los Angeles, Cal., for the U.S.

Before FLETCHER and NELSON, Circuit Judges, and EAST * District Judge.

NELSON, Circuit Judge:

Defendants appeal from their convictions of Medi-Cal abuse, contending there was a fatal variance between the indictment and the proof adduced at trial in that the evidence showed the remuneration was offered in return for the referral of *individuals* (42 U.S.C. § 1396h(b)(2)(A)), not for the ordering of *services* (42 U.S.C. § 1396h(b)(2)(B)) as charged in the indictment. Defendants also argue that the evidence was not sufficient to support the conviction because they lacked specific intent to violate the law. We find there was no variance between the indictment and proof, and the proof was sufficient to support the conviction. Accordingly, the judgment is affirmed.

FACTS

Appellant Universal Trade and Industries, Inc., doing business as Universal Medical Laboratories, ("Universal"), is a large medical laboratory that performs many services paid for by Medi-Cal. In 1979, Appellant Karimi was the administrative director of Universal.

In August 1979, Universal was contacted about a possible new account by Dr. Dorr, the administrator of a medical clinic in Glendale. Unbeknownst to Universal, Dorr was acting in concert with the F.B.I. Dorr secretly tape-recorded all of his conversations with Karimi and others regarding Universal.

Dorr told Universal that he was looking for a new laboratory to do his clinic's laboratory tests. He was interested in obtaining good service from a laboratory, as well as generating revenue for his clinic from the laboratory work.

Karimi negotiated for Dorr's business on behalf of Universal. Karimi told Dorr that Universal could not give him cash kickbacks from fees collected for any laboratory work done at Universal. Dorr suggested that the lab tests might be done on-site at his clinic in order to generate revenue.

After preliminary investigation and planning, Karimi told Dorr that Universal, and Karimi acting on his own behalf, would set up a laboratory in a small room at the clinic at no cost to the clinic. Karimi would handle all the administrative matters for the laboratory, including operations, personnel and accounting. The simple tests would be done at the on-site laboratory; the complicated tests would be sent out to Universal's main laboratory. Once it was set up, the laboratory would be owned by a separate corporation that would be formed (eventually to be known as Glendale Medical Lab, or "GML"). Although Dorr's clinic would not invest any money in GML or the laboratory, the clinic would own stock in the corporation; the other stockholders would be Karimi and Universal. The clinic would be paid a percentage of the corporation's gross revenues as an incentive for the clinic to refer more work to boost the corporation's gross.

The arrangements regarding the calculation of the clinic's remuneration were changed several times. First, Universal's attorneys rejected the gross revenue percentage because it looked too much like a kickback. Karimi said that Dorr, who Karimi then believed to be the one-half owner of the clinic, would instead get a percentage of the net profit and be paid a percentage of the gross as an administrative salary. Repeatedly, Karimi assured Dorr that he would have no administrative duties, but that it was necessary to call the percentage of gross a "salary" in order to avoid the appearance of a kickback. Later, Karimi

* The Honorable William G. East, Senior United States Judge for the District of Oregon, sitting by designation.

told Dorr that the clinic would get a percentage of the profits, which would be defined as a fixed percentage of the gross. Karimi said that a clinic physician, whom Dorr had named as the other owner of the clinic would be paid a percentage of the profits equivalent to a percentage of the gross revenues, so he would have incentive to order extensive laboratory tests on as many patients as possible.

## STATUTORY FRAMEWORK

The relevant statute is 42 U.S.C. § 1396h(b)(2) (Supp. IV 1980). It was amended in 1977 to provide that it is a felony to offer any remuneration to a person to induce such person:

(A) to *refer an individual* to a person for the furnishing, or arranging for the furnishing, of any item or service for which payment may be made in whole or in part under [the Medicaid programs], or

(B) to purchase, lease, *order or arrange for* . . . ordering any good, facility, service or item for which payment may be made in whole or in part under [the Medicaid programs].

42 U.S.C. § 1396h(b)(2) (Supp. IV 1980) (emphasis added).

## ISSUES AND STANDARD OF REVIEW

The issues on appeal are:

1. Whether there was a fatal variance between the indictment and the proof at trial; and,

2. Whether the evidence was sufficient to support the convictions of Karimi and Universal.

■ The standard of review on both issues is the substantial evidence test: whether, when the evidence is viewed in the light most favorable to the government, a reasonable jury could find the defendants

guilty beyond a reasonable doubt of each essential element of the crime charged.[1] *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Kenny,* 645 F.2d 1323, 1335 (9th Cir.1981); *United States v. Jacobo-Gil,* 474 F.2d 1213, 1214 (9th Cir.1973).

## DISCUSSION

### A. WAS THERE A FATAL VARIANCE BETWEEN THE INDICTMENT AND PROOF AT TRIAL?

■ The defendants argue that the controlling law for this case is found in *United States v. Stewart Clinical Laboratory,* 652 F.2d 804 (9th Cir.1981). In *Stewart,* this Court held that an indictment charging a violation of 42 U.S.C. § 1396h(b)(2)(A), which prohibits offering remuneration in return for Medi-Cal *patient* referrals, could not be the basis for a conviction where the facts showed that the kickbacks were offered in return for the ordering of Medi-Cal *services.* The facts of this case are clearly distinguishable from those of the *Stewart* case.[2]

In the *Stewart* case, the evidence showed that the kickback scheme called for the clinic to send the patients' *specimens* to the laboratory for testing. No patients were to visit the defendant's laboratory. The court said that it would be a "tortured construction of the statutory language" to interpret "referring an individual" to include sending specimens of an individual. 652 F.2d at 806–7.

There is no fatal variance in this case because the evidence shows the remuneration was offered to induce the clinic to order the defendants' laboratory services. The patient "referrals" in this case were only incidental to the main plan;[3] since the

1. *See United States v. Bottom,* 638 F.2d 781, 783–84 (5th Cir.1981) that explicates the concerns in respect to fair notice to the defendant and the right to protection against a second prosecution for the same offense that are at the heart of the inquiry.

2. In *Stewart,* the jury instructions varied from the indictment. The jury instructions in the

instant case conformed to the indictment. This is not an important factual difference when the sufficiency of the evidence is at issue. *United States v. Adkins,* 683 F.2d 1289, 1290 n. 1 (9th Cir.1982).

3. Perhaps defendants could have also been indicted under 42 U.S.C. § 1396h(b)(2)(A) for offering remuneration to induce patient referrals.

clinic's remuneration was to be calculated as a percentage of the gross billings of the laboratory, it was the number of tests ordered, not the number of patients referred, that determined the amount to be paid. Thus the scheme evidenced by the agreement of the defendants did constitute arranging for a facility, service or item for which payment was to be made under the Medicaid Program, bringing it clearly within 42 U.S.C. § 1396h(b)(2)(B).

## B. WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE CONVICTIONS OF KARIMI AND UNIVERSAL?

■ Appellants claim that they did not have the requisite specific intent to violate the law to support their convictions. The evidence is sufficient to support the jury's verdict. Although Dorr initially approached the defendants and expressed a desire to "generate revenue" through his clinic's laboratory work, the defendants took all the initiative in devising the kickback scheme. The only concrete suggestion made by Dorr was that the laboratory work might be done on-site at his clinic. Dorr did not suggest that he wanted to do anything illegal. It was Karimi, assumedly in concert with the owner of Universal, who suggested that Universal would set up the satellite laboratory at no cost to Dorr's clinic. Later, it was again the defendants who suggested using the corporation and paying the clinic a percentage of the gross. In fact, Dorr never even mentioned paying anything to the physician-owner; that kickback was solely the defendants' idea.

Appellant Karimi, alone, apparently argues that he was entrapped. The jury was instructed regarding entrapment, and its determination may not be overturned unless no reasonable jury could conclude beyond a reasonable doubt that the defendant was predisposed to commit the offense. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *United States v. Fekri,* 650 F.2d 1044, 1045 (9th

Cir.1981). The evidence was sufficient to support the jury's determination.

For the reasons stated, the judgment is AFFIRMED.

---

But that does not mean the indictment under 42 U.S.C. § 1396h(b)(2)(B) is improper. It is obvious from the language in the statute that the (A) and (B) subsections of § 1396h(b)(2) are not mutually exclusive, and that some conduct might come within either section.