**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John E. CROOKS, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph R. LAIRD, Jr., Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John E. CROOKS and Joseph R. Laird, Defendants-Appellants.**

**Nos. 84–5165, 84–5166, 84–5174 and 84–5182.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1986.

Decided Nov. 25, 1986.

Bruce G. Merritt, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

John E. Crooks, Panorama City, Cal., pro se.

Joseph R. Laird, Jr., Sherman Oaks, Cal., pro se.

Before CANBY, REINHARDT and NOONAN, Circuit Judges.

CANBY, Circuit Judge:

Joseph R. Laird, Jr., appeals his conviction by a jury of conspiracy to defraud the United States (18 U.S.C. § 371) and of aiding in the filing of false tax returns and of filing false tax returns (26 U.S.C. § 7206(1), (2)). John E. Crooks appeals his conviction by a jury of conspiracy to defraud the United States. We affirm.

**FACTS:**

Laird was president of Cal Am Corporation (Cal Am), a tax shelter promoter in Encino, California. Crooks, a former law partner of Laird, was attorney for Cal Am. Cal Am sold tax shelter investments purporting to entitle investors to writeoffs on their individual tax returns for mineral royalty payments under a tax shelter scheme devised by Laird.

Under Laird's scheme, investors were solicited to purchase interests in limited partnerships organized by Cal Am. The limited partnerships owned coal leases. An investor was told that he or she could claim an income tax deduction of more than three times the investor's original investment because the partnership would make a tax deductible advance mineral royalty payment.

Because the partnerships did not have sufficient funds to make the royalty payments which exceeded the amounts being invested and the partnership assets, Laird devised what the government calls a "check cycle," but what might better be called a "check cyclone," to create canceled checks representing loans and tax deductible payments to be used to sustain the deductions in the event of an audit by the IRS. In simplified terms, the scheme consisted of creating a shell corporation to function as a lender. A bank account was opened for the lender at the same bank where the limited partnership and the payee of the tax deductible payment, which was also controlled by Cal Am, had their bank accounts. On the day that the limited partnership was to receive a loan to enable it to make its tax deductible payment, numerous checks from the lender to the partnership, from the partnership to the payee, and from the payee to the lender were simultaneously deposited at the bank. All of the checks cleared the bank because they offset each other. The actual scheme employed by Laird was very complex, in-

volving over 100 limited partnerships, several lenders, conduit accounts, approximately a thousand checks and millions of dollars.

Laird and Crooks were indicted, along with one other co-defendant, Turner, under a ninety-six count indictment arising out of the tax shelter scheme. Counts 1 through 44 were severed for purposes of trial, and are the only counts relevant to this appeal. Counts 1 through 14[1] charge Laird with mail fraud, 18 U.S.C. § 1341, and Crooks and Turner with aiding and abetting, 18 U.S.C. § 2. Count 15 charges all three defendants with conspiracy, 18 U.S.C. § 371. The conspiracy charge alleges that Crooks, Laird and Turner conspired to commit securities fraud and to defraud the government. Counts 16 through 44 charge Laird with aiding in the filing of false tax returns and the filing of false tax returns, 26 U.S.C. § 7206(1) and (2).

On August 19, 1983, the jury returned verdicts acquitting all defendants on counts 1 through 14 and acquitting defendant Turner on count 15. The jury was deadlocked as to the remaining counts. On September 16, 1983, the district court declared a mistrial and ordered a new trial on count 15 and certain of counts 16 through 44.

Laird and Crooks filed an interlocutory appeal. We summarily affirmed. The retrial of Crooks and Laird began on April 25, 1984. During trial, the district court struck the securities fraud objective of the conspiracy alleged in Count 15 on the ground that it was barred by res judicata, and the trial proceeded with the sole objective of the conspiracy being fraud on the government.[2] In addition to count 15, Laird was retried on counts 16, 22, 24, 35, 38 and 44. The jury returned verdicts of guilty against Laird on all counts and against Crooks on count 15. Laird and Crooks raise numerous issues on this appeal.

## DISCUSSION:

### I. *Speedy Trial Act, 18 U.S.C. § 3161 et seq.*

Laird and Crooks claim that their rights under the Speedy Trial Act, 18 U.S.C. § 3161, were violated.

18 U.S.C. § 3161(e) governs speedy trial considerations for retrial situations.

If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final. If the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final, except that the court retrying the case may extend the period for retrial not to exceed one hundred and eighty days from the date of the action occa-

---

**1.** Counts 1 through 15 of the original indictment are reproduced in Appendix A to this opinion.

**2.** The redacted indictment presented to the jury in the retrial alleged that Crooks, Laird and Turned conspired "[t]o defraud the United States by hampering and obstructing by dishonest means the legitimate functions of the Internal Revenue Service of the Department of the Treasury." The objectives of the conspiracy were alleged as follows:

  a. LAIRD would design and promote a purported tax shelter involving partnership interests....
  ....
  c. CROOKS would sign the legal opinion to be included in the sales materials.
  d. LAIRD would cause the receipt of each investor's purchase money to be confirmed to that investor by sending various documents to the investor by mail.
  e. In the sale of the partnership interests, LAIRD, CROOKS, and TURNER would knowingly and willfully fail to disclose material facts which were known to them and would knowingly and willfully make misrepresentations of material facts....
  ....
  h. The check-looping operation would create the false appearance that certain payments important to the tax shelter program had been made when in fact they had not been made;
  i. This false appearance would be used to materially deceive the Internal Revenue Service as to the existence of these payments and the validity of deductions based on these payments.

sioning the retrial becomes final if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical. The periods of delay enumerated in section 3161(h) are excluded in computing the time limitations specified in this section. The sanctions of section 3162 apply to this subsection.

18 U.S.C. § 3161(e). Laird and Crooks argue that more than seventy days elapsed between the date on which the action occasioning retrial became final and the commencement of their retrial.

We review the district court's determination of factual issues under the Speedy Trial Act for clear error. *United States v. Feldman*, 788 F.2d 544, 547–48 (9th Cir. 1986). Questions of law are reviewed de novo. *Id.*

■ Appellants argue that the twenty-eight day period between the dismissal of the jury in the first trial and the entry on October 24, 1983, of the order setting their retrial should be included in calculating the speedy trial period. This argument is meritless. The district court's order, not the dismissal of the jury, constituted the action occasioning the new trial. Thus, the first day of the seventy day period prescribed by 18 U.S.C. § 3161(e) would have been October 25, 1983, except that appellants filed a notice of interlocutory appeal on that day.

The filing of the interlocutory appeal triggered a period of excludable delay. 18 U.S.C. § 3161(h)(1)(E). There is a dispute over when this period of excludable delay ended. Appellants contend that it ended on February 10, 1984, when this court summarily affirmed the district court's ruling, and ordered that the mandate issue forthwith. The government contends that the period did not end until February 15, 1984, when this court amended its order of February 10 to insert an erroneously omitted word. The district court entered an order ruling that the excludable period did not end until February 24, 1984, when the man-

date of this court was formally spread upon the records of the district court. We conclude that none of these proposed dates is the correct one.

■ Section 3161(h)(1)(E) simply provides for exclusion of any period of "delay resulting from any interlocutory appeal." It does not set the boundaries of the excludable period. The parties refer to section 3161(e), which provides that if a defendant is to be "tried again following an appeal ..., the trial shall commence within seventy days from the date the action occasioning the retrial becomes final" unless the trial judge extends the period for reasons not relevant here. Section 3161(e) is not literally applicable to interlocutory appeals; it refers to appeals requiring a retrial. Interlocutory appeals interrupt the seventy day period; they do not start it running. Nevertheless, it appears to us appropriate to apply the rule of section 3161(e) by analogy to interlocutory appeals, in order to determine when the time begins to run again. We therefore must determine what was the "action occasioning" further proceedings in the trial court following the interlocutory appeal, and when that action became final.

■ We conclude that the action which occasions the trial following an unsuccessful interlocutory appeal is the receipt of the appellate court's mandate by the district court, as reflected in the records of the district court.[3] It is that event which causes the district court to move the case forward toward trial. The records of the district court reflect that this court's mandate in the interlocutory appeal was lodged with the district court on February 14, 1984. The technical amendment that this court made to its order on February 15 did not lead to a recall or otherwise affect the finality of the mandate already issued. Nor should the district court's delay in formally spreading the mandate on its records serve to extend the excludable peri-

---

**3.** The defendants state that the parties informed the trial judge of this court's order on February 13, 1984, and furnished him a copy. We do not believe that this informal notification may be viewed as an action "occasioning" trial. In any event, one day would not change our result.

od attributed to an interlocutory appeal. *See United States v. Ferris,* 751 F.2d 436, 439–41 (1st Cir.1984) (interlocutory appeal time excludable to date mandate received by clerk of district court even though not docketed or brought to the attention of the district judge). The seventy day period then must be measured from February 14.

■ The defendants were brought to trial on April 25, 1984, seventy one days later. The seventy day limit was not violated, however, because on April 23, the government made a motion in limine that was denied on April 24. On April 24, the defendants moved to recuse the trial judge, and the motion was referred to another judge, who denied it on the same day. April 23 and 24 are therefore excludable under § 3161(h)(1)(F) (delay resulting from a pretrial motion). After the exclusion of these two days [4] and the time for the interlocutory appeal, sixty-nine days passed from the order of retrial to the retrial. The Speedy Trial Act was not violated.

## II. *Collateral Estoppel Effect of Acquittal on Mail Fraud Counts.*

Appellants were acquitted of 14 counts of mail fraud in their first trial. Appellants argue that the acquittal on those counts bars the relitigation of ultimate facts in the conspiracy charge of the redacted indictment.

■ The fifth amendment guarantee against double jeopardy encompasses the doctrine of collateral estoppel. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Hernandez,* 572 F.2d 218, 220 (9th Cir.1978). "The collateral estoppel doctrine means that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *United States v. Webbe,* 755 F.2d 1387, 1388 (9th Cir.1985) (quoting *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194). To determine whether collateral estoppel bars

a retrial of issues following an acquittal based on a general verdict, we inquire " 'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Webbe,* 755 F.2d at 1388 (quoting *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194; *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 239, 92 L.Ed. 180 (1948)).

In the context of a criminal case, the collateral estoppel analysis involves a three-step process. *United States v. Schwartz,* 785 F.2d 673, 681 (9th Cir.1986); *United States v. Hernandez,* 572 F.2d 218, 220 (9th Cir.1978).

> First, the issues in the two actions are identified so that we may determine whether they are sufficiently similar and material to justify invoking the doctrine. Second, we examine the first record to determine whether the issue was fully litigated. Finally, from our examination of the record, we ascertain whether the issue was necessarily decided.

*Schwartz,* 785 F.2d at 681. Laird and Crooks must, therefore, show that their acquittal on the mail fraud counts is inconsistent with conviction for conspiracy to defraud the government. *United States v. Powell,* 632 F.2d 754, 757 (9th Cir.1980).

The first two requirements set forth in *Schwartz* are probably met in this case. The essential elements of a mail fraud prosecution are a "scheme to defraud" and the use of the mails to execute or further the scheme. *See, e.g., United States v. Vardell,* 760 F.2d 189 (8th Cir.1985); *United States v. Bohonus,* 628 F.2d 1167 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). The mail fraud counts of which appellants were acquitted included in their allegations the generation of sham tax deductions, the

---

**4.** The government argues that several other days were excludable during the period covered by the second order. Because we find that the

Speedy Trial Act requirements have been met, we do not address the government's arguments.

scheme that is at the heart of the conspiracy conviction now under appeal. As far as we can tell from the record before us, the sham nature of the transactions was also fully litigated in the first trial.

We cannot conclude, however, that the jury necessarily decided in the first trial that appellants had not engaged in a scheme to defraud the United States.[5] The original indictment makes relatively clear the fact that the "scheme to defraud" by use of the mails was a scheme to defraud investors. It alleges a "scheme to defraud and to obtain money by means of false representations and promises." It alleges the distribution of promotional materials to investors to persuade them to invest, and that the sham nature of the transactions was concealed from investors, who invested $39 million in the promoted limited partnerships in 1976. These and other allegations are clearly directed toward the scheme of defrauding investors, who provided the money obtained by reason of the alleged false representations.

It is true that the mail fraud counts also include allegations that the scheme included production of cancelled checks to deceive the Internal Revenue Service in case of an audit of investors, and that to execute the scheme to defraud, appellants caused false and misleading partnership returns to be mailed to the Internal Revenue Service. Appellants argue that these allegations allege a scheme to defraud the government, and that the jury necessarily found that no such fraud had been committed.

■ Like the trial judge, who presided over the first as well as the second trial, we are unable to draw any such necessary

conclusion from the first verdict. Viewed in a "practical frame," *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 240, 92 L.Ed. 180 (1948), the fourteen mail fraud counts presented a scheme to defraud investors,[6] and to deceive the United States so that the fraud would not be discovered. While the sham nature of the transactions was certainly litigated, it was not necessarily decided by the acquittal for mail fraud. *See United States v. Webbe,* 755 F.2d 1387, 1389 (9th Cir.1985). The jury could well have determined that, even if the United States were being defrauded, the investors were getting what they bargained for. Indeed, the more successful the alleged deception of the Internal Revenue Service, the less the fraud upon investors; they would be getting their tax deductions. Similarly, the jury could have concluded that there was no intent to defraud the investors, and acquitted for lack of that necessary element. *See Bohonus,* 628 F.2d at 1172. Neither of these possibilities is inconsistent with the existence of a conspiracy by appellants to defraud the government. Appellants' collateral estoppel contention therefore fails.[7]

### III. *Sufficiency of the Evidence.*

Appellants also challenge the sufficiency of the evidence to sustain their convictions. We have examined the record and conclude that there is sufficient evidence to support the jury's verdict. *See United States v. Carruth,* 699 F.2d 1017, 1022 (9th Cir. 1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984).

■ On appeal, the evidence is evaluated in the light most favorable to the prosecution. *United States v. Drape,* 668 F.2d 22,

---

5. We are hindered in our analysis of the collateral estoppel issue because appellants have not presented us with the record of the first trial. No transcript of that trial is available to us. We have secured the court file of the first trial, and it contains the court's instructions to the jury. The instructions on the mail fraud counts are consistent with the trial court's ruling, in the second trial, that the thrust of the mail fraud counts in the first trial was that of fraud upon the investors.

6. It was on this theory that the trial judge applied collateral estoppel in redacting from the conspiracy charge the alleged securities fraud objective.

7. The filing of false tax returns does not require fraud or an intent to defraud, so the issue of res judicata, discussed with regard to the conspiracy charge, is not relevant to the counts that relate only to Laird.

25 (1st Cir.1982). We must determine whether there is sufficient evidence from which reasonable persons could find appellants guilty beyond a reasonable doubt. *Id.* In order to sustain Laird's convictions under 26 U.S.C. 7206(1), the evidence must show beyond a reasonable doubt that he acted willfully, with knowledge that the returns were not correct in material respects. *Id.* at 25–26. Laird's signature on the return is sufficient to establish knowledge once it has been shown that the return was false. *Id.* at 26.

■ In order to convict under 26 U.S.C. § 7206(2), the government must prove beyond a reasonable doubt that the defendant aided, assisted, procured, counseled, advised, or caused the preparation and presentation of a return; that the return was fraudulent or false as to a material matter, and that the act of the defendant was willful. *United States v. Dahlstrom,* 713 F.2d 1423, 1426–27 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). Willfully " 'simply means a voluntary intentional violation of a known legal duty.' " *Drape,* 688 F.2d at 26 (citing *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976)); *Dahlstrom,* 713 F.2d at 1427. The term "willful" " 'requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required.' " *Dahlstrom,* 713 F.2d at 1427 (quoting *United States v. Brooksby,* 668 F.2d 1102, 1104 (9th Cir. 1982)).

■ To establish a conspiracy to defraud the United States, the prosecution must prove the existence of an agreement to accomplish an illegal objective, an overt act in furtherance of the objectives of the conspiracy, and intent on part of the conspirators to agree, as well as to defraud the United States. *See United States v. Kaiser,* 660 F.2d 724 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982); *United States v. Shoup,* 608 F.2d 950, 956 (3rd Cir.1979). *See also United States v. Lane,* 765 F.2d 1376, 1380 (9th Cir.1985).

■ The evidence shows that Laird devised the tax shelter scheme and that he knew that the lenders and the partnerships, individually or together, did not have enough cash to pay the advance mineral royalties unless he employed the check cycle. Laird generated advance mineral royalty deductions through his tax shelter scheme. These deductions lacked economic substance. *See United States v. Clardy,* 612 F.2d 1139 (9th Cir.1980) (substanceless deductions for interest prepayments); *United States v. Ingredient Technology Corp.,* 698 F.2d 88 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (purchase of sugar to enable defendant to overstate its year-end inventory for purposes of using the LIFO method of inventory reporting). There was ample evidence of agreement to accomplish the objectives of the scheme. Thus, the evidence is sufficient to support Laird's convictions for conspiracy to defraud and for the counts relating to the filing of false returns.

The evidence is also sufficient to support Crooks' conviction on the conspiracy count. *See United States v. Lane,* 765 F.2d 1376, 1381 (9th Cir.1985) (evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight is sufficient).

## IV. *Due Process.*

The next argument presented by appellants is that the law regarding the deductibility of advance mineral royalty payments was so unsettled in 1976 that appellants' convictions violate due process. Appellants primarily rely on *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984) and *United States v. Mallas,* 762 F.2d 361 (4th Cir.1985).

In *Mallas,* the issue was "[w]hether annual advance minimum royalties that are recoupable from warranted coal reserves acquired after execution of a lease but before payment of the royalty may be de-

ducted from gross income ..." *Mallas*, 762 F.2d at 363. The applicable regulation, Treasury Regulation § 1.612–3(b), did not explicitly state that the advance mineral royalty payment was deductible in the year paid only if there were sufficient reserves committed in the first year of the lease so that the total amount of the advance mineral royalty payments required under the lease could be recouped. *Id.* at 364. The court concluded that there had been no "fair warning" of the criminal consequences of deducting advance mineral royalty payments if there was insufficient coal for recoupment.

*Dahlstrom* involved a tax shelter program that instructed those who purchased memberships in the defendants' organization on how to create foreign trust organizations (FTOs) in order to reduce tax liabilities. Thus, *Dahlstrom* does not involve the defendant orchestrating the generation of the questionable tax deduction. The defendants in *Dahlstrom* merely assisted their clients (members) in setting up individual tax shelters utilizing FTOs. Experts testified "that the legality of the tax shelter program advocated by the appellants in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment." *Id.* 713 F.2d at 1428. *Dahlstrom* did not involve a check cycle similar to that employed by Laird or in *Clardy*.

The evidence presented in this case indicates that Laird wished to keep his method of funding the advance mineral royalty payments confidential. Cash payments were made to his contact at the bank that handled the check cycle transactions. The transactions were carefully orchestrated. They manufactured deductions for cash payments when the cash never existed. We conclude that Laird knew that the partnerships lacked the funds from which to make the advance mineral royalty payments and devised the check cycle to create the deductions. His circular transaction could be characterized as borrowing money, paying oneself a royalty payment, and paying back the lender, leaving each party

in the same position it was in before the transaction. "When the taxpayer has by his own wrongful actions created a situation where certain payments are open to several interpretations, he cannot complain if the conclusion of the trier-of-fact differs from his own, if there is a reasonable factual basis for the decision." *United States v. Miller*, 545 F.2d 1204, 1215 (9th Cir.1976) (applying rules of constructive corporate distribution to criminal tax proceeding), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). The doctrine of substance versus form is well ensconced in tax law. The expert testimony in this case, unlike that in *Dahlstrom*, was that there was undoubtedly no real payment entitled to a deduction. Due process is satisfied in this case. For the foregoing reasons, we also reject appellants' contention that the Cal Am advance mineral royalty deductions were valid as a matter of law.

### V. *Sufficiency of the Indictment.*

Laird and Crooks challenge their convictions on the grounds that the indictment fails to charge a crime against the United States. Laird argues that the "essence of the government's case was that the method of financing used in the questioned transactions was illegitimate *per se* and statutorily impermissible." To a large extent, this argument is simply a restatement of appellants' argument that a transaction cannot be an illegal sham when the checks that were cycled were paid when presented. That the checks were paid, however, does not change the fact that cash deductions without substance (cash) were manufactured and concealed.

"An indictment must provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense and plead double jeopardy at a later prosecution." *United States v. Lane*, 765 F.2d 1376, 1380 (9th Cir.1985). In addition to the conspiracy charge, the indictment charges Laird with

violations of 26 U.S.C. § 7206(1) and (2).[8] The indictment sets out in detail the nature of the allegedly illegal tax shelter scheme and each defendant's alleged involvement. The indictment sufficiently charges all offenses to provide defendants with notice of the charges against them. The fact that Laird and Crooks contest the substance of the offenses charged, does not render the indictment insufficient.

## VI. *Expert Advice Is not a Complete Defense.*

■ The expert advice upon which Laird apparently relied was that of a former IRS auditor, who was not a lawyer. The advice Laird received related to structuring the tax shelter so that it would be less vunerable to audit. Reliance on advice of counsel is not an absolute defense, but it is a factor to be considered in assessing good faith and intent. Counsel must, however, have been fully informed of all relevant facts, unbiased, and competent. *See United States v. Winans,* 612 F.Supp. 827, 848 (S.D.N.Y.1985), *aff'd in part, rev'd in part,* 791 F.2d 1024 (2d Cir.1986). The jury, which was properly instructed on the defense of advice of counsel, could rationally have concluded that the nature of the advice was such that reliance upon it did not establish good faith or lack of intent.

## VII. *Jury instructions.*

■ Appellants argue that they were entitled to a jury instruction describing the accrual method of reporting because, under Treasury Regulation 1.612–3(b), advance mineral royalty payments may be deducted when paid or accrued or when the mineral product with regard to which the advance royalties were paid is sold. The evidence indicates that the partnerships used the cash method of accounting and that is what Laird intended. Therefore, the district court did not abuse its discretion by refusing to give the requested instruction.

## VIII. *Other issues.*

We find all other issues raised by appellants, including the allegation that the trial judge was biased, to be without merit. We have reviewed the record of the trial and find no evidence of bias on the part of the trial judge who ably presided over two very lengthy and complex trials.

AFFIRMED.

### APPENDIX A

### UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

September 1980 Grand Jury

CR 82–175

UNITED STATES OF AMERICA, Plaintiff,

v.

JOSEPH R. LAIRD, JR., JOHN E. CROOKS, WILLIAM H. TURNER, Defendants.

### INDICTMENT

(18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 371: Conspiracy; 15 U.S.C. § 77(q)(x): Fraud in the Offer and Sale of Securities; 26 U.S.C. § 7206(2): Aiding, Counseling and Procuring the Filing of False Income Tax Returns; 26 U.S.C. § 7206(1): Submission of False Federal Income Tax Documents to the I.R.S.)

The Grand Jury charges:

---

8. Any person who—
   (1) **Declaration under penalties of perjury.**—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or
   (2) **Aid or assistance.**—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document ...
   shall be guilty of a felony....
   26 U.S.C. § 7206(1), (2).

## COUNTS ONE THROUGH FOURTEEN

### (18 U.S.C. § 1341; § 2)

1. Beginning in or about September, 1976, and continuing to a time unknown to the grand jury, but at least until April, 1977, in the Central District of California and elsewhere, defendant JOSEPH R. LAIRD, JR. knowingly and willfully devised a scheme to defraud and to obtain money by means of false representations and promises as more fully set forth in paragraphs 2 through 10 of this indictment.

2. At all times mentioned in this indictment LAIRD was a lawyer practicing in Los Angeles and elsewhere. He was president of Cal-Am Corporation, a company which was in the business of creating, promoting and selling tax shelters.

3. Beginning in or about September, 1976, LAIRD designed various materials for a tax shelter deal which purported to involve coal mining leases. These sales materials invited potential investors to invest as limited partners in partnerships whose business was stated to be the operation of coal mining leases in Wyoming and elsewhere. The sales materials indicated that large tax-deductible payments, known as advance mineral royalty payments, would be made by the partnerships in 1976. The sales materials further explained that, due to the passing on of these tax deductions to the limited partners, any person who became a limited partner in 1976 would be able to take over three dollars in tax deductions on his 1976 tax return for every one dollar he invested. Because most investors invested $3,000 or more, this meant that most investors would get at least $10,000 in tax deductions by investing in this program.

4. At the time LAIRD designed the sales materials, he knew and intended that the huge tax deductions shown in the sales materials would be a major factor in persuading investors to invest. He also knew and intended that the allegedly tax-deductible advance mineral royalty payments on which these deductions depended would, in fact, not be made.

5. Specifically, the sales materials told potential investors that LCB Ranch, Sun River Ranches or Dynarad would loan each of the partnerships the money the partnership needed to make the tax-deductible advance mineral royalty payments. At the time LAIRD designed the sales materials, he knew that all three of the entities mentioned, LCB Ranch, Sun River Ranches and Dynarad, were shell corporations which lacked the ability to make these loans. He knew and intended that the partnerships would not receive sufficient money to enable them to make the advance mineral royalty payments, and that therefore these tax-deductible payments would not be made. LAIRD knew and intended that as the result of the non-existence of the alleged loans, the tax deductions described in the sales materials were for the most part fictitious and worthless.

6. To execute this scheme, LAIRD caused the sales materials to be distributed to prospective investors. He concealed the sham nature of the deductions from these investors. Largely in reliance on the non-existent deductions, approximately three thousand investors invested approximately $39 million in 1976 in the limited partnerships described in the sales materials. The bulk of this money was diverted by LAIRD to various companies controlled by him.

7. A limited partner is normally informed of the amount of his allowable deductions on a Form K-1, which is prepared and delivered to him by the managing partner of the partnership. The Internal Revenue Service requires the managing partner to file also a Form 1065 which sets forth all the allowable deductions for the partnership. A managing partner of each of the limited partnerships described in the sales materials was either LAIRD or his close associate Kenneth J. Fisher. LAIRD intended to conceal the non-existence of the deductions by causing K-1's to be sent to the investors and 1065's to be sent to the Internal Revenue Service, all reflecting the non-existent deductions. By this means, as LAIRD knew and intended, the investors would be led to believe they were entitled to the deductions and to claim them on

their tax returns. The Internal Revenue Service would be induced to process the deductions as if they were valid and to give the investors credit for them.

8. At all times relevant to this indictment, LAIRD also knew that the Internal Revenue Service sometimes investigates, or "audits", limited partnerships which have been the source of large tax deductions. It was part of LAIRD's scheme to defraud that he would attempt to conceal the non-existence of the tax-deductible payments claimed in 1976 by generating cancelled checks which he could show to the Internal Revenue Service in case of an audit. At the end of 1976, as part of this scheme, he and his associates cycled hundreds of checks totalling over $500 million through accounts at the Western Bank of Commerce in Westwood, California in an effort to generate cancelled checks which would look like the tax-deductible advance mineral royalty payments described in the sales materials.

9. The essence of this cycling, or check loop, was that the entities from whom the limited partnerships were to obtain the money to make the tax-deductible payments wrote checks in the appropriate amounts to the limited partnerships, who in turn wrote checks which appeared to be the tax-deductible payments. On or about the same day, however, the bulk of the tax-deductible payments were simply returned to the entities who had originally advanced the money to the limited partnerships. This part of the scheme was made possible by the fact that LAIRD controlled all of the entities and all of the bank accounts for all of the entities involved in the scheme. Virtually all of the entities were shells whose principal purpose was to act as conduits in the check loop.

10. To execute this scheme to defraud, LAIRD caused 1976 U.S. Partnership Returns of Income, Forms 1065, for the below-listed partnerships to be sent by mail to the Internal Revenue Service from the Central District of California in or about April, 1977. All of these forms were false

and misleading, as LAIRD well knew, in that they reflected deductions for advance mineral royalty payments which had in material part not been made.

| COUNT | LIMITED PARTNERSHIP |
|---|---|
| 1 | Inkom Co. |
| 2 | Journal Co. |
| 3 | Freeburn Co. |
| 4 | Bicknell Co. |
| 5 | Fort Pierre Co. |
| 6 | Anaconda Co. |
| 7 | Quarter Co. |
| 8 | Cannelton Co. |
| 9 | Dominion Co. |
| 10 | Joplin Co. |
| 11 | Kismet Co. |
| 12 | Nomad Co. |
| 13 | Provo Co. |
| 14 | Aspen Co. |

11. At all times mentioned in this indictment, defendant JOHN E. CROOKS was an attorney for Cal-Am and a long-time associate of LAIRD.

12. At all times mentioned herein, defendant WILLIAM H. TURNER was vice-president of the Western Bank of Commerce in Westwood, California.

13. CROOKS and TURNER knowingly and willfully aided and abetted LAIRD in the commission of the offenses alleged in Counts One through Fourteen of this indictment.

## COUNT FIFTEEN

(18 U.S.C. § 371; 15 U.S.C. §§ 77(q)(x))

14. The grand jury charges in Count Fifteen all the charges set forth in paragraphs 2, 3, 11, and 12 of this indictment.

15. From on or about October, 1976 to a time unknown to the grand jury but at least until April 1, 1977, within the Central District of California, CROOKS, LAIRD and TURNER conspired with each other as follows:

(1) To use instrumentalities of communication in interstate commerce to make false representations and to engage in fraudulent business practices in connection with the sale of securities, namely, the above-described limited partnership interests in the 1976 coal tax shelter program, in violation of Title 15, United

States Code, Sections 77(q) and 77(x), part of the Securities Act of 1933; and

(2) To defraud the United States by hampering and obstructing by dishonest means the legitimate functions of the Internal Revenue Service of the Department of the Treasury.

16. The objects of this conspiracy were as follows:

a. LAIRD would design and promote a purported tax shelter involving partnership interests as more particularly described in paragraph 3 of this indictment.

b. TURNER would permit his name to be used as a reference in the sales materials for this purported tax shelter;

c. CROOKS would sign the legal opinion to be included in the sales materials.

d. LAIRD would cause the receipt of each investor's purchase money to be confirmed to that investor by sending various documents to the investor by mail.

e. In the sale of the partnership interests, LAIRD, CROOKS and TURNER would knowingly and willfully fail to disclose material facts which were known to them and would knowingly and willfully make misrepresentations of material facts.

f. The money received from the investors would be deposited in the Western Bank of Commerce;

g. TURNER, as an officer of the bank, would aid LAIRD and CROOKS in running a gigantic check-looping operation at the bank;

h. The check-looping operation would create the false appearance that certain payments important to the tax shelter program had been made when in fact they had not been made;

i. This false appearance would be used to materially deceive the Internal Revenue Service as to the existence of these payments and the validity of deductions based on these payments;

j. Investors would be lulled into failing to discover the fraud by sending false Forms K–1 to the investors and false Forms 1065 to the Internal Revenue Service, all reflecting the non-existent payments.

16. (sic)In furtherance of this conspiracy:

a. LAIRD designed the sales materials and caused salesmen to distribute them to potential investors;

b. TURNER permitted his name to be listed as a reference in the sales materials;

c. CROOKS signed an opinion letter dated November 12, 1976;

d. LAIRD signed a materially misleading letter to Mr. Robert Wynn, dated November 24, 1976;

e. LAIRD signed a materially misleading letter to Samuel Oshin, dated November 29, 1976;

f. LAIRD caused to be mailed to the investors the sales confirmations above referred to;

g. CROOKS helped set up two sham Nevada partnerships to be used in the check-looping scheme;

h. CROOKS attempted to enlist Cal-Am employees as shareholders in two shell corporations also to be used in the check-looping scheme;

i. LAIRD arranged to have all the checking accounts to be used in the check-looping scheme opened at the Western Bank of Commerce;

j. LAIRD designed the check-looping scheme.

k. TURNER permitted the check-looping operation to be run through the Western Bank of Commerce on three days at the end of November, 1976;

l. In late 1976 and again in the summer or fall of 1977, LAIRD directed that TURNER be paid cash payments, once for $10,000 and once for $15,000;

m. TURNER accepted these cash payments from employees of Cal-Am;

n. On or about April 1, 1977 LAIRD caused to be sent to the Internal Revenue Service the Forms 1065 described in Counts One through Fourteen of this indictment.