ESTATE OF SILVIO RAVETTI, DONNA IRENE LOGAN, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ravetti v. Commissioner
Docket No. 26617-82
United States Tax Court
T.C. Memo 1993-343; 1993 Tax Ct. Memo LEXIS 345; 66 T.C.M. (CCH) 299; August 3, 1993, Filed *345 Decision will be entered for respondent. P invested in a limited partnership (Harding) which was involved in coal mine leases. On his income tax return for 1976, P deducted, as a loss, a $ 48,315 loss attributable to Harding's operations. P claimed, in the alternative, a theft loss in regard to Harding. P also invested in a limited partnership which purchased a motion picture. In regard to this investment, P deducted $ 19,195 as an ordinary loss and claimed investment tax credits of $ 13,650 for the tax year 1978. P asserted the statute of limitations as a bar against respondent in regard to the tax years 1976 and 1977. Held: 1. P failed to demonstrate any defects in the waiver of period of limitations. Deficiencies for 1976 and 1977 are not barred by the statute of limitations. 2. As a result of P's stipulation agreeing to all findings of fact and legal conclusions in Hawley v. Commissioner, T.C. Memo. 1988-77, P may not deduct $ 48,315 as a loss in the operations of Harding. 3. P fails to satisfy the criteria of sec. 165, I.R.C.; as a result, P is not entitled to a theft loss deduction in regard to his investment in Harding. *346 4. P did not establish that the limited partnership which acquired the above-mentioned motion picture had a profit motive or that the venture had economic substance. Thus, P is not entitled to deduct ordinary losses and claim investment tax credits with respect thereto. 5. R's determination of additions to tax under sec. 6651(a), I.R.C. for 1976 sustained. For petitioner: Richard H. Foster. For respondent: Tim A. Tarter. NIMS
NIMS
MEMORANDUM OPINION NIMS, Judge: Respondent determined the following deficiencies and additions to tax: Additions to Tax
Year
Deficiency
Sec. 6651(a)
1976
$ 10,774
$ 1,451
1977
$ 43,851
--
1978
$ 61,039
--
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for decision are as follows: (1) Whether the statute of limitations bars respondent from assessing deficiencies for the tax years 1976 and 1977. (2) Whether petitioner is entitled to deductions amounting to $ 48,315 attributable to his interest in a Cal-Am limited partnership for the tax *347 year 1976. (3) Whether, in the alternative, petitioner is entitled to a theft loss with respect to his investment in a Cal-Am partnership. (4) Whether petitioner is entitled to ordinary deductions of $ 19,195 and investment tax credits of $ 13,650 attributable to his interest in the C & M limited partnership and claimed on his 1978 tax return. (5) Whether petitioner is liable for an addition to tax pursuant to section 6651(a) for the tax year 1976. (6) Whether petitioner is liable for additional interest at the rate provided in section 6621(d) for 1976. Respondent disallowed deductions for payment of advanced coal royalties in 1977 and 1978 in the amounts of $ 171,500 and $ 67,500, respectively. On brief petitioner fails to pursue this issue and is presumed to have abandoned it. Background
This case was submitted fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Silvio Ravetti (Ravetti) resided in California at the time he filed his petition. He died during the course of this dispute, and pursuant to an order of this Court "Estate of Silvio Ravetti, Donna Irene Logan, Executor," was substituted as petitioner *348 (petitioner). In 1950, Ravetti married Martha Ravetti. They were divorced in 1982. During the years at issue they filed joint income tax returns. Martha Ravetti filed a separate petition, which was assigned Docket No. 27142-82, and is not a party to this case. An order appointing a conservator for Ravetti was filed on February 4, 1985. The Order Appointing Conservator states that Ravetti was unable to provide for his personal needs and was substantially unable to manage his financial resources or resist fraud or undue influence. Harding Company was a limited partnership promoted and sold by the Cal-Am Corporation in 1976. It was one of 296 similar Cal-Am Coal Tax Shelter Partnerships. On his 1976 return Ravetti deducted $ 48,315 as a loss attributable to the operations of Harding. In the Stipulation of Facts it is stated that "Petitioner and respondent agree to and incorporate as part of this stipulation, all findings of fact and legal opinions reached by the Tax Court in Hawley v. Commissioner, T.C. Memo. 1988-77." Harding was one of the 296 Cal-Am coal tax shelter partnerships involved in the Hawley case. The parties further stipulated *349 that all 296 Cal-Am partnerships were identical, except for the following items: The dollar amounts involved; the presence of Black Rock in some cases or International Coal in others as the lessor of the coal lease; the presence of Joseph Laird in some cases or Kenneth Fisher in others as the individual general partner; the presence of Cal-Am Corporation in some cases or Dixie Natural Resources in others as the corporate general partner; and the description of the geographical location of the coal referred to in the leases. Respondent and petitioner also stipulated that during the Hawley trial, Joseph Laird, in his capacity as general partner of Harding, made the following admissions: That the Cal-Am partnerships were not intended to become involved in the actual mining of coal; that the Cal-Am partnerships never intended to finance any mining operations; that the partnerships had no obligation to mine coal and no sale of mined or recovered coal took place; that the net amount of cash received from the limited partners in the 1976 Coal Tax Shelter program was $ 25,000,000 and that the partnerships had no right to this money; that the funds were controlled by Joseph Laird and *350 used by him to purchase a motion picture studio, a hotel, 152 condominiums, four Convair airplanes, one small jet, and some mining equipment; that Joseph Laird did not consider the multiple costs involved in mining noncontiguous properties which were acquired for the partnerships; that no one associated with Joseph Laird was sufficiently skilled to develop a mining program; that neither Joseph Laird nor Kenneth J. Fisher, as general partners, contributed to the development of the coal leases; and that Joseph Laird neither believed it necessary nor did he or any of his associates assure the limited partners of making a profit. Lastly, petitioner and respondent agreed to be bound by the opinion of the United States Court of Appeals for the Ninth Circuit in United States v. Crooks, 804 F.2d 1441 (9th Cir. 1986). That case involves, in part, Joseph Laird's appeal of his conviction for defrauding the United States, aiding in the filing of false tax returns, and filing false tax returns. Cruise Missile, Ltd. (C & M) was a California limited partnership organized in 1978. Its general partner was Film Services Corp. (Film Services), a California corporation. *351 Film Services solicited the sale of C & M limited partnership interests in a private offering calling for a purchase price of $ 150,000 for each of ten units offered. Ravetti purchased one such unit. The purchase price of each unit was payable by $ 15,000 cash in 1978, a note for $ 15,000 due on December 31, 1979 and a second note for $ 120,000 due on or before December 31, 1985. The $ 120,000 note was payable only from film rental proceeds and could be renewed indefinitely for periods of seven years. Each unit entitled the investors to 10 percent of the profits and losses of the partnership. In addition, the limited partners received a 75-percent interest in the capital of the partnership. The general partner was not required to contribute any capital to C & M and was not a participant in C & M's profits and losses. The general partner was, however, entitled to a 25-percent interest in capital and a management fee equal to 3 percent of the partnership's net cash flow. C & M was formed for the purpose of purchasing a feature length motion picture originally entitled "Cruise Missile" (film). C & M purchased the film from 21st Century Film Management Corporation (21st Century) *352 for a total purchase price of $ 1,500,000. This amount was payable as follows: $ 150,000 in cash before December 31, 1978; $ 150,000 by a short-term note due on or before December 31, 1979; and $ 1,200,000 by a note payable December 31, 1985. The note for $ 1,200,000 was payable only out of the proceeds received from rentals of the film. Executed simultaneously with the purchase of the film rights was an agreement requiring C & M to aid in the purchase of release prints of the film by providing up to $ 160,000 in cash or notes. C & M executed a similar agreement which required it to provide up to $ 200,000 in cash or notes to be applied toward advertising the film. Pursuant to these agreements, C & M executed a note for $ 155,000 payable on or before December 31, 1985, in favor of Ora Advertising and Marketing (Ora Advertising) and a second note for $ 200,000, also payable to Ora Advertising. Both of these notes were payable only out of film rental proceeds and were renewable indefinitely in 7-year intervals. At the time the limited partners acquired their interests, they executed guaranty agreements for their proportionate shares of the $ 1,200,000 partnership note in favor *353 of 21st Century, as well as their proportionate shares of the $ 200,000 note in favor of Ora Advertising. In this manner, each partner guaranteed $ 140,000 of C & M's liabilities. The film purchased by C & M was produced by Noble Productions, Inc. (Noble) in co-production with several foreign producers. Nobel's costs approximated $ 400,000, excluding contingent compensation arrangements with the actors. The film was primarily shot in Iran and France. Once the film was completed, Noble assigned all U.S. and Canadian (except French Canada) rights in the film to 21st Century for a total consideration of $ 113,000. The film starred Peter Graves, Kurt Jurgens, Michael Dante, and John Carradine. It received its first U.S. booking on December 7, 1979 at the Carri Theatre in Florence, Alabama. Only three other bookings, one each in Georgia, Iowa and Texas, were secured thereafter. Box office receipts for the film totaled $ 1,062. Non-theatrical showings of the film through January, 1981, grossed approximately $ 6,740. None of these proceeds ever reached the partnership since the proceeds were first applied against marketing and other promotional costs, including commissions of *354 the distributors. All distribution rights for the film were assigned by 21st Century to Ika Panajotovic, the film's producer and sole owner of Noble. For the years 1978 and 1979, C & M filed U.S. partnership returns showing the following amounts of income and net losses: 1,978
1,979
Gross Receipts
0 0 Interest Income
0 4,216 Less: Depreciation
(83,332)
(500,000)
Net Loss
$ (83,332)
$ (495,784)
Interest income reported by C & M for the 1979 year represents interest paid by the limited partners on the portion of their capital investment, which was deferred by the note payable in 1979. C & M computed depreciation expenses of the film on the straight-line method over a useful life of 3 years. The basis of the film claimed for purposes of depreciation was $ 1,500,000. For the year 1978, the partnership used a basis of $ 1,895,500 for purposes of computing an investment tax credit. Petitioner concedes all adjustments related to an entity known as the Spring Valley Partnership. Petitioner also concedes all adjustments proposed by respondent regarding contribution deductions for 1977 and 1978. The parties also agree that the adjustments to medical expenses *355 determined by respondent are computational and will be redetermined based upon our resolution of the issues. Discussion
On brief, petitioner argues that a decision in this case should not be reached until the Court of Appeals for the Ninth Circuit decides whether petitioner is entitled to equitable relief from Martha Ravetti's settlement agreement with respondent. Petitioner, however, fails to advance any adequate grounds or persuasive arguments as to why we should continue this case. On November 18, 1988, petitioner moved to amend and supplement the petition in this case to include the issue of equitable relief. We denied that motion on December 12, 1988. Consequently, this issue is not properly before us, and petitioner's discussion of it on brief is inappropriate. We focus first on whether respondent is time barred from assessing taxes and additions to tax for the years 1976 and 1977. Petitioner argues that, although valid on their face, certain consents to extend the limitations period are invalid because at the time Ravetti executed them he was laboring under a mental defect, specifically Alzheimer's disease. Petitioner asserts that since contract principles generally *356 apply to such written agreements, a consent to extend the time to assess tax executed by an incompetent is invalid and unenforceable. The record contains a Form 872, Consent to Extend the Time to Assess Tax and two Forms 872A, Special Consents to Extend the Time to Assess Tax. Form 872 relates to 1976. It was executed by Ravetti on December 19, 1979, and by respondent on January 11, 1980, and extended the assessment period to December 31, 1981. Ravetti filed his return for 1976 on June 21, 1977. Thus the 3 year period of limitations did not expire prior to the time Ravetti and respondent executed Form 872. The first Form 872A also relates to 1976. It was executed by Ravetti on August 15, 1981, and by respondent on August 25, 1981. Consequently, it was executed prior to the expiration of the period for assessment of Ravetti's 1976 liability as extended by Form 872. The second Form 872A relates to tax year 1977. It was executed by Ravetti on April 24, 1981, and by respondent on May 11, 1981. Since Ravetti filed his return for 1977 on September 18, 1978, this consent was executed within the period of limitations for assessing Ravetti's 1977 tax liability. By their terms, *357 Forms 872A extend the time to assess tax to a date on or before the 90th day after: (A) The Internal Revenue Service Office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s), or (B) The Internal Revenue Service mails Form 872-T to the taxpayer(s), or (C) The Internal Revenue Service mails a Notice of Deficiency for such periods. * * *
Forms 872A further provide that if a notice of deficiency is sent to the taxpayer, the time for assessing the tax will end 60 days after the period during which the making of an assessment was prohibited. In this case, respondent mailed the notice of deficiency for tax years 1976, 1977, and 1978 to Ravetti on August 13, 1982. The parties stipulated a copy of a declaration dated May 19, 1988, given in a State Court proceeding by Stephen Krause, M.D., Director of McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California. In the declaration Dr. Krause states that he was Ravetti's psychiatrist from late 1980 until early 1982; that Ravetti was admitted to McAuley on November 10, 1980, and discharged on December 5, 1980. Dr. Krause *358 diagnosed Ravetti's condition as "A. Presenile dementia, probably Alzheimer's disease, early;" and "B. Major depressive episode, agitated, secondary to diagnosis A." Dr. Krause states that a person suffering from this disease is likely to have memory impairment, poor judgment, and continued paranoia, and that this disease "could have" had an effect on his business behavior since as early as 1976. The copy of Dr. Krause's declaration refers to two exhibits, namely, Ravetti's medical history and "physical" at the time of his admission to McAuley, and his discharge summary. Neither exhibit is included with the copy of the declaration which the parties stipulated. Dr. Krause's declaration, given for some unstated purpose in another case, is insufficient to establish Ravetti's mental incompetence on the dates he signed the three waivers, namely December 19, 1979, April 24, 1981, and August 15, 1981. The mere fact that Ravetti was under the care of a psychiatrist is insufficient to establish Ravetti's incompetence on any of the relevant dates. And, as we have noted, an order appointing a conservator for Ravetti was not obtained until February 4, 1985, over three years after the last *359 Form 872A was signed by Ravetti. Under these circumstances respondent was reasonably entitled to place reliance upon the waivers which were in all respects regular in form. See Hollman v. Commissioner, 38 T.C. 251, 260 (1962), supplemented by T.C. Memo. 1962-236. At this point the burden of proof was on petitioner to show that the waivers were invalid. See Goldberg v. Commissioner, T.C. Memo. 1984-617. As demonstrated, petitioner has failed to sustain this burden. The next issue involves the Harding limited partnership. On his 1976 return Ravetti deducted $ 48,315 as a loss attributable to his interest in Harding. Respondent contends that petitioner is not entitled to this deduction because a profit motive was lacking on the part of the limited partnership, and the transaction lacked economic substance. We again note that both respondent and petitioner agreed to be bound by Hawley v. Commissioner, T.C. Memo. 1988-77. Of the four issues decided in Hawley, the one relevant to the instant proceeding is whether the various Cal-Am coal partnerships had a *360 profit motive when they entered into coal leases, and whether the coal lease transactions lacked economic substance. Id. In deciding this issue in Hawley, we concluded that the primary objective of the Cal-Am partnership was to invest in limited partnerships which would produce tax deductions for the investors; that the partnerships did not engage in coal mining activities, and no coal was ever commercially mined or produced; that there was a lack of arm's-length dealing among the various entities; that the investment prospectus made substantial allusions to the tax benefits of the limited partnerships; that the purchase prices paid for the coal mining leases were inflated and could not be supported by any expected income; that Joseph Laird, who controlled many of the limited partnerships, never made an on-site investigation of the coal reserves; and that the financing involved a circular flow of money. Our ultimate conclusion was that the transactions as well as the partnerships' activities were devoid of economic substance. Id. Since petitioner has agreed to be bound by the findings of fact and conclusions of law in Hawley, we hold for respondent on this issue. *361 Petitioner's argument that Ravetti's state of mind when he made the investment in the Harding partnership precludes a finding of tax avoidance is irrelevant since Ravetti's state of mind when he made the investment is not at issue. Petitioner argues, in the alternative, that if Ravetti is not entitled to a loss deduction attributable to Harding, section 165 entitles him to a theft loss. Petitioner contends that since Joseph Laird, the promoter of the limited partnerships for Cal-Am Corporation, was indicted for securities fraud and filing false tax returns, Ravetti's investment was stolen. Petitioner relies on Nichols v. Commissioner, 43 T.C. 842 (1965), to support her argument that a theft loss is allowable in the years at issue with respect to Ravetti's investment in the Cal-Am coal tax shelter. A theft loss is deductible only in the year in which the theft is discovered. Section 165 provides in relevant part: SEC. 165. LOSSES. (a) GENERAL RULE. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) LIMITATION ON LOSSES OF INDIVIDUALS. -- In the *362 case of an individual, the deduction under subsection (a) shall be limited to -- * * * (3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.
* * * (e) THEFT LOSSES. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. [Emphasis added.]
Unlike the situation in Nichols v. Commissioner, supra, petitioner has offered no evidence upon the basis of which the year in which the theft was discovered, or the amount of the loss, can be determined. At best, the record establishes that Ravetti claimed a loss of $ 48,315 on his 1976 return. But since the possibility of theft did not originally figure in Ravetti's claiming this deduction, the "discovery" of any loss related to the investment must have occurred in some later year. Furthermore, the amount of a claimed tax shelter deduction generally involves an amount substantially greater than the investor's outlay to *363 acquire the investment; e.g., his allocable share of depreciation, investment credit, and the like, so that in the case before us the $ 48,315 loss claimed is meaningless in the context of a theft loss deduction. Cf. Nichols v. Commissioner, 43 T.C. at 883-884. The next issue involves a deduction of $ 19,195 and investment tax credits of $ 13,650 claimed by petitioner for the tax year 1978 in connection with C & M. Respondent argues that C & M lacked economic substance. Petitioner addresses the issue of economic substance in his Opening Brief with a discussion of the film purchased by C & M. In particular, petitioner emphasizes that the film's producer was a well-known figure in the film industry and that the three primary actors were popular movie personalities. Petitioner also states that the film's lack of profitability resulted from a change in current events, which sharply decreased the public's interest in the subject matter of the film. She concludes by stating "Where the movie is bonafide, losses are allowed." Petitioner's arguments fail to address respondent's contention that C & M's purchase of the movie lacked a profit motive and economic *364 substance. The fact that the movie itself was made by well-known figures in the entertainment industry has little, if any, bearing on the economic substance of the transactions in which C & M engaged. Put simply, the intent of those who made and produced the movie does not establish that C & M's involvement had economic substance. In a case such as this we consider both the taxpayer's (here, the partnership's) subjective business motivation and the objective economic substance of the transaction to determine whether the transaction was, in effect, a sham. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. on this issue four memorandum opinions of this Court. There is no evidence that the terms of the purchase here were actually negotiated between C & M and 21st or between Ravetti and C & M. There is no evidence that C & M negotiated with 21st over either the actual terms of the agreement or the purchase price. Instead, the documents reflect a package deal. Thus, while C & M purchased the film rights from 21st for a total price of $ 1,500,000, the cash amount paid by 21st to acquire the film was only $ 113,000. The remainder *365 of the purchase price was paid by instruments which could only be realized upon in the unlikely event that the film proved to be successful beyond reasonable expectations. As above stated, box office receipts totaled only $ 1,062, and nontheatrical receipts were only $ 6,740. This particular cinematic venture has all the earmarks of a product which was dead on arrival when the partnership bought it and on which the producers and promoters hoped to salvage their investment by promoting a tax shelter deal. The $ 113,000 paid by 21st for the film, which was quickly followed by the sale of the film to C & M for an illusory $ 1,500,000, confirms the probability that such was the case. As in most sham tax shelters, the bulk of the consideration, consisting of nonrecourse promissory notes, is deferred: specifically, $ 1,350,000 of the $ 1,500,000 total. And of this amount, $ 1,200,000 represented an amount to be paid only out of proceeds received from the film. In addition, C & M funds which were to be used to purchase release prints and advertising were satisfied by notes, renewable indefinitely at 7-year intervals, again payable only out of the film rental proceeds. The Court may *366 look beyond the paper to find the actual substance and economic realities of a transaction. Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1989), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987). The nature of the dealings between the parties, the disparity between the purchase price and the fair market value of the property acquired by Ravetti, and the illusory nature of the financing transaction establish that the transaction lacked economic substance, and that the partnership had no other purpose then tax avoidance. In summary, we conclude that petitioner has not established that the C & M transactions were bona fide arm's-length transactions at fair market value, that the transactions were entered into for profit, or that the transactions had any economic substance other than the avoidance of taxes. For the year 1976 respondent determined a $ 1,451 late filing addition to tax pursuant to section 6651(a). Petitioner has the burden of proof *367 on this issue. Rule 142(a). The sum total of petitioner's response to respondent's determination is contained in the following two sentences: "The simple answer to all of respondent's arguments with respect to additions was the fact that the taxpayer was incompetent. No matter how the Court decides this case, additions should not be allowed." As previously discussed, petitioner has not established at what point Ravetti may be deemed to have been incompetent to manage his affairs prior to the appointment of a conservator on February 4, 1985. The return in question was due to be filed April 15, 1977, almost eight years earlier. Consequently, we are unable to conclude that petitioner has shown that Ravetti's late filing was due to reasonable cause and not due to willful neglect, a showing necessitated by the provisions of section 6651(a) to avoid the late filing addition. We next consider whether petitioner is liable for increased interest pursuant to section 6621(d), as asserted by respondent in an affirmative pleading. Respondent, by reason of having pleaded a new matter, bears the burden of proof on this issue. Rule 142(a). Beyond a cursory assertion that the Cal-Am transactions *368 were shams, respondent does not explicate with specificity the application of section 6621(d) to this case. We decline to attempt to supply the missing links, noting in passing that the question of increased interest was not raised in Hawley. We hold for petitioner on this issue. To reflect the foregoing, and taking account of the fact that there is no increased deficiency as a result of our ruling with regard to section 6621(d), Decision will be entered for respondent.