JOSEPH R. LAIRD, JR., AND PATRICIA J. LAIRD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Laird v. Commissioner
Docket No. 2718-83
United States Tax Court
T.C. Memo 1994-564; 1994 Tax Ct. Memo LEXIS 572; 68 T.C.M. (CCH) 1191; T.C.M. (RIA) 94564; November 10, 1994, Filed *572 Decision will be entered under Rule 155. Joseph R. Laird, Jr., pro se. For Patricia J. Laird, petitioner: Victor D. Abrunzo, Jr.
For respondent: Tim A. Tarter. DAWSON, DINAN
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1976
$ 1,082,175
$ 541,087
1977
8,422
4,211
In a Motion to Amend Answer filed September 11, 1986, respondent affirmatively asserted *573 fraud with regard to Joseph R. Laird, Jr. (hereinafter referred to as petitioner), only. The issues for decision are: (1) Whether petitioners are entitled to deduct $ 8,191,720 in losses attributable to their interests in 150 limited Cal-Am coal shelter partnerships as claimed on their joint individual 1976 Federal income tax return and as carried over to their 1977 joint Federal income tax return; (2) whether petitioners failed to report as income $ 1,705,842 received from Legal Mortgage Corp. in 1976; [2] (3) whether petitioners failed to report as income $ 177,608 received from Cal-Am Financial Corp. in 1976; (4) whether petitioner is liable for the addition to tax pursuant to section 6653(b) for the years 1976 and 1977; and (5) whether petitioner Patricia J. Laird (hereinafter referred to as Mrs. Laird) is an innocent spouse pursuant to the provisions of section 6013(e). [3]
*574 FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioner and Mrs. Laird timely filed joint Federal income tax returns for 1976 and 1977 pursuant to extensions. The returns were prepared by Bruce Waldman, a certified public accountant (C.P.A.). His signature appears on the returns. On petitioner and Mrs. Laird's 1976 Federal income tax return, petitioner reported compensation of $ 150,000. On Schedule E, Supplemental Income Schedule, attached to the return, petitioner reported a total of $ 8,191,720 in losses. On Mrs. Laird's Schedule C, Profit or (Loss) From Business or Profession, regarding her real estate activity, she reported $ 20,619 as gross receipts or sales and $ 15,109 as net profits. On petitioner and Mrs. Laird's 1977 Federal income tax return, petitioner reported compensation of $ 120,000. On Schedule E attached to the return, he reported a total of $ 8,152,684 in losses. On Mrs. Laird's Schedule C, she reported $ 28,258 as gross receipts or sales and $ 21,963 as net profits. 1. The Cal-Am Coal Shelter Partnerships
The Cal-Am coal shelter partnerships *575 involved in this case were the subject of this Court's opinion in Hawley v. Commissioner, T.C. Memo. 1988-77. Petitioner was the principal fact witness in Hawley. His testimony in that case has been stipulated into evidence in this case. The parties also have stipulated into evidence the opinion of the U.S. Court of Appeals for the Ninth Circuit in the case of United States v. Crooks, 804 F.2d 1441 (9th Cir. 1986). That case was brought by the United States against John E. Crooks and petitioner for conspiring to defraud the United States, aiding in the filing of false tax returns, and filing false tax returns. The parties have further stipulated into evidence portions of the transcript of trial pertaining to the case of People v. Cal-Am Corp., No. C. 193603 (Cal. Super. Ct., Los Angeles County) a case tried in the Superior Court of California, County of Los Angeles. In that case, the State of California sued the defendants to recover the amounts invested by the limited partners in the Cal-Am coal shelter partnerships, and a judgment in the amount of $ 7,348,500 was entered against each of the following defendants: *576 Joseph R. Laird, Jr., Cal-Am Corp., Dixie Natural Resources, and Allstate Securities. Petitioners resided in California when the petition was filed in this case. Petitioner was admitted to the New York State Bar in 1951 and the California State Bar in 1954. He practiced law in California beginning in 1954, specializing in Federal taxation, real estate construction, and real estate sales. He has also promoted various tax shelters involving real estate, master recordings, motion pictures, and gemstones. In 1976, petitioner was president of the Cal-Am Corp. (Cal-Am). In his capacity as president of Cal-Am, petitioner formed 296 limited partnerships as part of the 1976 Cal-Am Coal Tax Shelter Partnerships program (hereinafter referred to as the Cal-Am partnerships). The following organizations were associated with the various Cal-Am partnerships: Legal Mortgage Corp. (LMC) Allstate Securities, Inc. (Allstate) Sun River Ranch (Sun River) LCB Ranch (LCB) Dixie Natural Resources (DNR) Dynarad Corp. (Dynarad) GPF Coal Investments (GPF) GPL Specializing Investments (GPL) Black Rock Resources, Inc. (Black Rock) International Coal Leasing, Inc. (International Coal) Kings Point *577 Corp. (Kings Point) All of these organizations, except Allstate, were controlled by petitioner and Kenneth Fisher (Fisher). James Forbes (Forbes) was an officer of Cal-Am and an officer and director of Allstate, the broker-dealer for the sale of the Cal-Am partnerships. In 1976, Cal-Am issued to selected individuals private offering memorandums (POM'S) for the sale of units in the various Cal-Am partnerships. The POM'S were dated September 20, 1976, and contained the following introductory statement (as exemplified by the Moroni Co. POM): The Partnership has been formed for the purpose of acquiring and operating coal mining leases. The coal mining leases include the right to mine coal to exhaustion from the leased premises. * * * In order to develop the coal properties, the Partnership intends to enter into a mining contract. The contract will require the contract miner to begin mining as soon as practicable. * * * In the event an independent mining contractor's services are unavailable, Dixie will assume the above contractual obligations on the terms set forth above. Under the terms of the lease which was entered in October 1976, the Partnership will pay in 1976 an *578 advanced mineral royalty of $ 1.00 per ton on 287,500 tons for total consideration of $ 287,500. The source of the total cash paid in 1976, consists of $ 67,200 contributed from the limited partners and $ 220,300 which has been loaned to the partnership from LCB Ranch, Inc., on a non-recourse basis.
In 1976, the Cal-Am partnerships entered into coal mining leases with Black Rock and International Coal, allegedly starting on October 27, 1976. The leases were to run for 7 years and required that an advance royalty payment be made on December 31, 1976. Each of the partnerships allegedly leased coal-bearing lands in the States of Colorado and/or Wyoming. Each partnership lease allegedly provided for sufficient coal reserves so that any advance royalty payments claimed as deductions would not exceed 80 percent of the total reserves. The coal-bearing properties allegedly assigned to each partnership lease covered 5, 10, 40, or 80 acres located in Colorado and Wyoming; the acreage assigned to each partnership was randomly selected and was, more often than not, not contiguous. The various coal-bearing properties were assigned by petitioner to the various partnerships. His reasons *579 for assigning the various coal-bearing lands were haphazard, at best. He did not have a written geological report that estimated the coal reserves in Wyoming. He did have in hand a report estimating the coal reserves in Colorado, known as the Runge Report. That report had been prepared by a geologist not affiliated with Cal-Am. The leases provided that the lessees would pay a royalty equal to the greater of 15 percent of the net pit price for coal plus 20 cents per ton of coal or $ 1 per ton. The leases required a $ 287,500 advanced royalty payment, which would be recouped from the first 287,000 tons of coal mined. The lessor warranted that the leased land offered recoverable coal in excess of 133 percent of the amount required to recover the advance royalty payments. The original purchases of the coal mining leases, necessary for the viability of the various partnerships, are at best, confusing, and at the least, obscure. Petitioner informs us that in 1976, as president of Cal-Am and president and vice president of International Coal and Black Rock, he solicited a relationship with Charles Spaulding, who was president of P.C. Development Corp. (hereinafter P.C.). Petitioner *580 wanted Mr. Spaulding to acquire the various coal leases necessary to allocate coal reserves to the various Cal-Am partnerships. Pursuant to petitioner's instructions, Mr. Spaulding opened an office in Casper, Wyoming, to acquire coal leases. Mr. Spaulding proceeded to acquire coal leases or options to purchase coal leases on behalf of petitioner. The leases or options were purchased by Mr. Spaulding in the name of P.C. or DNR. DNR was fully controlled by petitioner. Mr. Spaulding's purchasing operations were a fundamental aspect of the 1976 Cal-Am coal program. The purchase price for each coal-bearing property varied, but representative leases were acquired for $ 22 per acre for Colorado property and $ 50 per acre for Wyoming property. The leases or options purchased by Mr. Spaulding in the name of DNR were, by agreement between Mr. Spaulding and DNR, transferred to P.C. in consideration for the consulting services P.C. provided to DNR in acquiring coal leases and in furtherance of an agreement that P.C. would sublease the coal-bearing properties to Black Rock and International Coal. Both Black Rock and International Coal were formed in 1976 to enter into coal mining leases *581 with the Cal-Am partnerships. Black Rock was controlled by Fisher; International Coal was controlled by petitioner. P.C. did not pay any money to DNR or anyone else to acquire any of the leases although the leases provided for royalty payments to P.C.; petitioner testified that Black Rock and International Coal were not required to pay royalties until coal was actually mined. On October 27, 1977, P.C. assigned all its leases to Martco, a Nevada corporation incorporated by petitioner and Fisher, and retained an overriding royalty interest sufficient to pay the royalties due the original lessors. Subsequently, Martco changed its name to Attorneys Title Co.
In 1978, all of the leases held by the Cal-Am partnerships were transferred to Attorneys Title Co. as trustee. Petitioner and Fisher executed the trust agreements for the partnerships. Attorneys Title Co. was controlled by John E. Crooks, petitioners' friend and attorney. The original contribution of capital to each of the Cal-Am partnerships was $ 400 and was made by Forbes, who was the sole limited partner in each of the partnerships when the partnerships were formed. The partnerships then paid those amounts to either Black *582 Rock or International Coal for the purchase of the leases and as a downpayment of the advance royalty payments. The partnerships were also obligated to make payments based upon a formula which included cash and nonrecourse notes equal to 3-1/4 times the cash investment. Each partnership provided for a $ 67,200 cash investment from the limited partners. There was also a nonrecourse note for $ 220,300. If a partner did not have the original cash investment, LMC offered to provide financing to that partner on a recourse basis. Black Rock deposited into a bank account the proceeds from the sales of the units in the various Cal-Am partnerships and issued to Fisher a check in an amount equal to 80 percent of the cash and notes Black Rock received. Fisher then deposited the moneys received in an account maintained by GPL. Petitioner was the general partner of GPL. GPL then lent the moneys in its account to either Dynarad or LCB on a recourse basis. International Coal issued checks to petitioner in amounts equal to 80 percent of the moneys International Coal received from the Cal-Am partnerships. Petitioner allegedly deposited the funds in GPF, which was controlled by Fisher. GPF *583 then lent money on a recourse basis to Dynarad and Sun River. On December 31, 1976, the date when the advance royalty payments were due, Dynarad, Sun River, and LCB lent to the various Cal-Am partnerships, on a nonrecourse basis, enough money to pay off their loans to Black Rock and International Coal. Through various machinations devised by petitioner, the loans were concocted so that the moneys lent by GPL to Dynarad and LCB ultimately were lent to Cal-Am partnerships in which petitioner was the noncorporate general partner. The loans by GPF to Dynarad and Sun River ultimately were lent to Cal-Am partnerships in which Fisher was the noncorporate general partner. The circular flow of loans and checks engineered by petitioner was so complicated that petitioner had to provide bank personnel with a flowchart showing them how to record the contrived financial transactions. A summary of checks covering a 3-day period from November 29 through December 1, 1976, drawn on the various accounts of Cal-Am-related organizations is as follows: Account
Amount Checks
International Coal TAC
$ 64,857,200 12
Joseph R. Laird
46,792,500
95
GPF Coal Invest
44,493,000
8
Sun River Ranches
6,609,000
14
Black Rock TAB
60,423,036
10
Kenneth J. Fisher
36,316,936
96
GPL Specialized Invest
29,864,736
7
LCB Ranch
7,049,600
32
Legal Mortgage Corp.
23,847,610
218
Dynarad LMC T/A
63,143,520
155
Cal-Am Investors Acct II
24,244,416
175
Cal-Am Mineral P'ship Acct
4,124,736
46
Cal-Am Disb. Acct
220,300
1
Dixie Natural Resources
33,050
221
Allstate Securities
250,000
2
J.R. Forbes #024728
98,244
180
Cal-Am Investors Acct
- 0 -
0
J.R. Forbes #064352
27,904
41
214 Partnerships
101,377,820
389
Total  513,773,608
1,702
*584 The cumulative balances of the various accounts of the Cal-Am-related entities on November 28 and December 1, 1976, were $ 2,500,172.68 and $ 10,388,487.83, respectively. The resulting difference between November 29 and December 1 is accounted for by contributions made by limited partners in the amount of approximately $ 7,800,000. The issuance of checks by the various Cal-Am-related organizations in the amount of $ 513,773,608, which far exceeded the cash available, was the result of a scheme which was aptly described by the U.S. Court of Appeals for the Ninth Circuit in United States v. Crooks, 804 F.2d at 1443: Because the partnerships did not have sufficient funds to make the royalty payments which exceeded the amounts being invested and the partnership assets, Laird devised what the government calls a "check cycle," but what might better be called a "check cyclone," to create canceled checks representing loans and tax deductible payments to be used to sustain the deductions in the event of an audit by the IRS. In simplified terms, the scheme consisted of creating a shell corporation to function as a lender. A bank account was opened for *585 the lender at the same bank where the limited partnership and the payee of the tax deductible payment, which was also controlled by Cal Am, had their bank accounts. On the day that the limited partnership was to receive a loan to enable it to make its tax deductible payment, numerous checks from the lender to the partnership, from the partnership to the payee, and from the payee to the lender were simultaneously deposited at the bank. All of the checks cleared the bank because they offset each other. The actual scheme employed by Laird was very complex, involving over 100 limited partnerships, several lenders, conduit accounts, approximately a thousand checks and millions of dollars.
Gross proceeds from the sales of Cal-Am partnership units approximated $ 39 million; $ 15 million of that amount was allegedly spent for overhead, and the remaining amount, approximately $ 24 million, was used to purchase preferred stock in Kings Point, a corporation owned and controlled by petitioner. Kings Point, in turn spent the $ 24 million for the following: (1) Laird International Studios (a movie studio); (2) expenses incurred in refurbishing Laird International Studios; (3) expenses *586 allegedly incurred for the exploration and development of coal leases; (4) condominiums in Hawaii; (5) the Royal Hawaiian Hotel; (6) a yacht purchased for $ 450,000; (7) five airplanes purchased for $ 125,000 each and a jet aircraft purchased for $ 400,000; (8) land development in Riverside, Oregon; (9) land development in Boardmor, Oregon; (10) production of five movies.
In 1978, petitioner effected a novation of the various Cal-Am partnership loans. LCB, Sun River, and Dynarad assigned the partnerships' loans to Black Rock and International Coal. The partnerships' interest due on the notes was forgiven. At the same time, LCB, Sun River, and Dynarad, which had borrowed moneys from GPL and GPF to lend moneys to the partnerships, were forgiven the payments on principal and interest due on the loans from GPL and GPF. This was the death knell for petitioner's check cycling scheme, and the Cal-Am partnerships, on paper, owed the principal of their loans to Black Rock and International Coal. None of the coal reserves allocated to the various partnerships was ever mined. Sometime prior to March 30, 1978, petitioner compiled a report on the activities and the properties *587 involving the 1976 Cal-Am partnerships. On March 30, 1978, petitioner mailed copies of the report to those who had invested in the Cal-Am partnerships. The second full paragraph of the letter prepared by petitioner to forward the report to investors in the partnerships reads: This report is the result of an analysis of information supplied by those persons listed in the report and Appendix A thereto. In addition, considerable information was obtained from various publications and studies which have been referenced in the report. While we believe all representations made by others which appear in this report are true and correct, we cannot warrant their accuracy. We have made certain conclusions and projections based upon the premises and information supplied us by others which are referenced in the report. We cannot be certain that the events upon which the conclusions and projections were premised will occur, nor can we be certain that other intervening circumstances will not occur, even if the events premising the conclusions do occur, which would alter the conclusions and projections.
Prior to the trial of this case, petitioner retrieved his report from his files and *588 presented it to Mr. Spaulding, president of P.C. On February 7, 1992, Mr. Spaulding prepared the following document: DECLARATION Charles Howard Spaulding declares as follows: 1. That he is qualified to testify as an expert witness regarding the subject matter of the controversy; 2. That the information set forth in Exhibit A attached hereto and incorporated herein is true and correct; 3. That the information set forth in Exhibit B titled "Coal Report" is substantially correct; 4. That the "economically minable coal reserves" available to the 297 1976 Cal-Am Corporation and Dixie Natural Resources Corporation limited partnerships were in excess of 264 million tons. I declare under penalty of perjury that the foregoing is true and correct. Executed on February 7, 1992, at Phoenix, Arizona. /s/
Charles Howard Spaulding Declarant
Petitioner's report was attached to Mr. Spaulding's declaration. At trial, petitioner presented Mr. Spaulding as an expert who testified that he adopted petitioner's report as his own report. The Court received in evidence the report with the following comment: While it's not without doubt in my mind, I will rule on *589 the side of caution and I will accept this as Mr. Spaulding's expert report on the grounds that he has adopted these third party evaluations and insofar as the weight of this report is concerned, that will be up to examination by counsel for the respondent, and it will be up to me finally, to decide how much weight I will give the report, of course.
After having thoroughly reviewed the report, the Court finds that it is deserving of no credit whatsoever, and we will entirely disregard it. Respondent's expert, Robert Hamilton, is a mining engineer who had been employed by the Internal Revenue Service for approximately 10 years at the time of trial. He graduated from the Texas College of Mines and Metallurgy in 1949 with a bachelor of science in mining engineering and a geology option. From 1949 until 1982, he worked as a mining engineer and a geologist. For much of that time, he worked at various properties of the Anaconda Co. He was also chief geologist at the Chukekamato, Chile, mine in northern Chile and Chief Geologist at the Sarchesh Ma mine in Iran. Mr. Hamilton was asked to render an opinion as to whether the various coal leases assigned to the 150 Cal-Am partnerships *590 in which petitioners had an interest could be economically mined to produce coal. Respondent introduced into evidence Mr. Hamilton's expert report, which thoroughly analyzed the leases entered into by the 150 Cal-Am partnerships in which petitioners invested. Mr. Hamilton explained that there are two general methods used in coal mining, open pit (or strip) mining and underground mining. A third method, coal gasification, was experimental and certainly had not been perfected at the time the Cal-Am partnerships were formed. The general scheme was to use drill holes in the unmined, undisturbed coal to recover a part of the energy value without physically removing the coal. A channel needed to be prepared connecting the various drill holes. The coal would then be burned in place, oxygen and steam would be pumped down an injection hole to promote the burning process, and gas with heating potential would be recovered from a production well. The gas could be used in surface plants to produce steam and/or electricity, or in some cases, chemical products. It was Mr. Hamilton's expert opinion that none of the tracts assigned to the 150 Cal-Am partnerships in issue was capable of supporting *591 an economically viable underground coal gasification project. For deeply buried coal seams, the traditional underground mining method is called "room and pillar", which literally describes the operation. A shaft must be sunk to below the mining level. The coal is then mined from alternating mining rooms. An equal amount of coal is left in place as a "pillar" to support the mine roof. The result is a checkerboard of mined-out rooms and remaining pillars. This method allows the removal of only 50 percent of the coal. There are basically four kinds of open pit mining. The first uses a dragline, a type of dredging machine, to strip and remove the overburden. The coal seam is then mined with power shovels, loaded into large capacity trucks, and hauled to the destination. A second method of removing the overburden is the use of portable transport belt sections which are loaded with the overburden by bulldozers. A third method uses a bucket wheel, which is huge and expensive and may be used only where the overburden does not contain hard or rocky beds. The last method uses scrapers to remove the overburden. These are large pan type vehicles that are pulled by diesel cabs and, *592 when loading, pushed by bulldozers and are used where the overburden is soft and can be easily picked up. To plan any mining operation, open pit or underground, the miner must have precise data as to the thickness of the coal and its quality, and the exact position of the coal within the limits of the tract. The necessary data is usually obtained by diamond drilling and the use of electric well logging to supplement data obtained from drill cores. It is expensive to acquire the data necessary before mining can commence. The Cal-Am partnerships had not engaged in any activity to obtain the necessary premining data nor had anyone on their behalf done so. Mr. Hamilton first evaluated the Wyoming leaseholds, which consisted of many different tracts. He grouped the tracts by county and then by township and, in his report, stated his opinion as to the mining potential for each of the tracts. Mr. Hamilton next evaluated the Colorado leaseholds. Those leaseholds were generally located in the area known geologically as the Cheyenne Basin. In his report, he states his opinion as to the mining potential in the various areas within the Cheyenne Basin where the various leaseholds were *593 located. Mr. Hamilton concluded: "All of the tracts studied are the same in that there is insufficient coal reserves on each to sustain a mining operation on a profitable basis. There were no exceptions." Mr. Hamilton assumed that each partnership was an independent mining unit that would be mined separately. The POM's issued by Cal-Am to selected individuals, dated September 20, 1976, stated: The General Partner is also general partner in other similar limited partnerships already formed. The General Partner intends to be involved as general partner in similar limited partnerships to be formed in the future. However, the General Partner, acting on behalf of the instant Partnership, will not enter into any transaction with any other limited partnership in which the General Partner or its affiliate has an interest.
Either petitioner or Fisher was the general partner in each of the partnerships. Petitioner noted, however, that in 1978, all the leases held by the Cal-Am partnerships were transferred to Attorney's Title Co. as trustee. Either petitioner or Fisher executed the trust agreements for each of the partnerships. Virtually all the leases held by DNR were also *594 transferred to the trust and were executed by petitioner. Petitioner challenged Mr. Hamilton's opinion on the ground that many of the tracts of land leased by the various partnerships in Wyoming could have been mined as one unit. Mr. Hamilton explained that even if all of the mining of the partnership tracts in Wyoming were operated under the direct control and supervision of one company, the coal leased by the partnerships in Wyoming could not have been mined at a profit. The only practicable way to mine the partnerships' coal is by the open pit method. It must first be determined if the coal is to be mined to the limit of the tract. The depth to the floor of the proposed pit and the nature of the overburden will dictate a minimum safe slope angle for the final pit walls. If the pit is to be very shallow, with the coal seam very near the surface, the pit walls can be very steep, almost vertical. As the pit floor goes deeper, then the walls must be sloped to protect personnel and equipment from cave-ins. If the coal is to be mined to the limit of the tract, arrangements must be made with the landowner of the property on all four sides of the tract to lease land to permit the *595 sloping of the pit walls. Provision must also be made for a haulage ramps. For every 10 vertical feet of pit depth, the ramp is 100 horizontal feet. If the floor of the pit is 100 feet from the surface, the length of the ramp will be 1,000 feet. If the ramp is to be external to the tract, again land must be leased from the adjacent property owner. Also arrangements must be made to provide for spoil piles, or deposits of overburden that is removed, even if there is a cluster of tracts in one location, after that cluster of tracts had been mined. Mr. Hamilton gave as an example the largest block of tracts leased by the partnerships in Wyoming consisting of approximately 320 acres. The block of tracts is located to the west of the Welsh Mine and consists of 10-acre tracts that are all nicely mixed together. The various tracts within the block are leased by 32 different partnerships. Mr. Hamilton observed: of those 32 tracts, all of the tracts on the outside are going to have to make an agreement for slope lines. Someone is going to have to sacrifice their coal to put a ramp in, and among these, then you have to get all 32 owners to agree who is going to sacrifice their *596 coal, and who is going to get the profits of the unhindered coal.
Continuing to address the 320-acre block of tracts, Mr. Hamilton stated on cross-examination by petitioner: you have a very large number of tracts which have no numbers in them, signifying no lease, which to me means that ground does not belong to you, and you have a very widely scattered smattering of 5 acre tracts, separated by other 5 and 10-acre tracts, which would be an impossible situation. Then, in addition, Mr. Laird, I took, for the area of the Welsh Mine, from the data, the published data that I had, I just ran a quick tonnage estimate, I did specifically a tonnage estimate on the 320 acres, where you have closely spaced tracts. And, I found that the cost of stripping; I used an average of 70 feet overburden for that area, and the cost of stripping consumed over half of the value of the coal in there. That is not paying for any equipment, any personnel, any overhead, any hauling.
Mr. Hamilton's opinion was that the coal which was allocated to the Cal-Am partnerships could not be economically mined. There is no credible evidence in the record to the contrary. 2. Petitioner and Mrs. Laird
*597 Mrs. Laird graduated from high school in 1953. She had no further education. Petitioner and Mrs. Laird were married in 1965. He adopted Mrs. Laird's son by a prior marriage, Peter. In the latter part of 1973, Mrs. Laird decided to engage in the real estate business. She took the test necessary to become a licensed real estate agent in the State of California and was actively engaged in the real estate business in 1974, 1975, and the years in issue. Petitioner and Mrs. Laird separated in 1980 and were divorced in 1982. In order to provide for herself and her son, Mrs. Laird sued petitioner for spousal support. In an order filed November 24, 1982, the Superior Court of the State of California for the County of Los Angeles awarded Mrs. Laird temporary exclusive use and control of the family home and the car she was using. Mrs. Laird was also granted spousal support of $ 2,500 per month to commence on November 5, 1982. In an order filed in the Superior Court in Los Angeles on October 8, 1982, in the case of People v. Cal-Am Corp., No. C 193603 (Cal. Super. Ct., Los Angeles County), petitioner was found to be liable to investors in the Cal-Am coal shelter program in the *598 amount of $ 7,348,500, and his assets were placed in a State Court Receivership. Cal-Am Corp. filed a Chapter 11 bankruptcy petition on or about November 8, 1982 (LA-82-19286-WL). On the same day, petitioner filed a personal bankruptcy petition (LA-82-19285-JA/WL). The Cal-Am Corp. bankruptcy case is still pending. As a result of the above-mentioned litigation, Mrs. Laird, at the time this case was tried, had received no support payments from petitioner. Her standard of living has been entirely dependent on her own sources of income. For the past 10 years, Mrs. Laird has been living on a comparably modest income derived from real estate commissions and some rental income from renting a portion of her house. Petitioner believed that his wife, who unsuccessfully inquired about his business affairs, was unable to understand anything about the complexity of the tax shelter programs in which he was involved. He refused to discuss any business matters with her because such discussions would lead to argument. After assuring Mrs. Laird that the returns were correct, petitioner ordered her to sign the 1976 and 1977 Federal income tax returns without providing her with the opportunity *599 to review them. The parties have stipulated that petitioner "is a well-educated person, an experienced attorney and tax shelter promoter, and a sophisticated businessman." Mrs. Laird relied on petitioner, her tax attorney husband, and his certified public accountant to correctly prepare the Federal income tax returns. [4]
Petitioner was in charge of the family finances. He directed Mrs. Laird to pay the household bills. Petitioner did not give her money on any set schedule; she would have to ask him for money when bills had to be paid. Petitioner gave Mrs. Laird $ 25,000 as a Christmas gift in 1975. She deposited that amount in her own bank account and used the money, together with amounts she earned as a real estate agent, to pay some household expenses in 1976. In *600 that year Mrs. Laird reported a net profit of $ 15,109 from her real estate business while petitioner earned approximately 10 times that amount. Petitioner gave Mrs. Laird $ 100,000 as a Christmas gift in 1976. Petitioner borrowed the money for the gift from Kings Point. Kings Point is in bankruptcy in the U.S. Bankruptcy Court for the Central District of California. In a Second Amended Statement of Affairs of Debtor Engaged In Business, filed June 29, 1983, with the Bankruptcy Court, petitioner is shown as owing Kings Point $ 680,000 which includes the $ 100,000 borrowed to make the 1976 Christmas gift to Mrs. Laird. The $ 100,000 is not related to any of the omissions from income or disallowed deductions at issue in this case. OPINION Issue 1. Petitioners' Claimed Losses Resulting From Their Interest in 150 Cal-Am Partnerships
Petitioners claimed an $ 8,191,720 loss on their 1976 Federal income tax return and the resulting $ 8,026,611 net operating loss carry-forward on their 1977 return as loss flow-throughs from their investments in 150 Cal-Am partnerships. Deductions are strictly a matter of legislative grace, and the taxpayer bears the burden of proving entitlement *601 to any deduction claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933). In Hawley v. Commissioner, T.C. Memo. 1988-77, we thoroughly examined the partnerships in issue and determined that the Cal-Am coal shelter program, which included the Cal-Am partnerships in issue, was devoid of economic substance. We arrived at that ultimate finding of fact by reviewing and comparing the facts in Hawley in accordance with the criteria set forth in Rose v. Commissioner, 88 T.C. 386, 411, 412 (1987), affd. 868 F.2d 851 (6th Cir. 1989), in which we defined a "generic tax shelter" as having the following characteristics: (1) Tax benefits are the focus of promotional material; (2) the investors accept the terms of the purchase without price negotiations; (3) the assets in question consist of packages of purported rights difficult to value in the abstract and substantially overvalued as part of the package; (4) the tangible assets are acquired at a relatively small cost shortly *602 prior to the transactions in questions; and (5) the bulk of the consideration is deferred by promissory notes, nonrecourse in form or substance. Upon reviewing each of the above-enumerated factors, we found that the 1976 Cal-Am coal shelter program lacked economic substance. The facts involving the 1976 Cal-Am coal shelter program in this case are substantially identical to the facts found in Hawley. For the reasons fully set forth in our Hawley opinion, by this reference we reaffirm our finding in that case that the 1976 Cal-Am coal shelter program lacked a profit motive, was devoid of economic substance, and cannot be recognized for Federal tax purposes. See Helba v. Commissioner, 87 T.C. 983 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). We hold that petitioners are not entitled to deduct any losses on their 1976 and 1977 Federal income tax returns allegedly resulting from their interests in 150 Cal-Am partnerships. Issue 2. Petitioners' Income From LMC
During November and December of 1976, LMC issued 17 checks payable to the order of petitioner in the total amount of $ 705,842.50 *603 and two checks payable to the order of Western Bank of Commerce for cashier's checks payable to "Joseph R Laird, Jr" in the amount of $ 500,000 each for a total of $ 1,705,842.50. In the statutory notice of deficiency for the year 1976, respondent determined that the $ 1,705,842.50 was income to petitioners in that year. As we have previously noted, respondent has conceded that $ 700,000 of the $ 1,705,842.50 should not have been included in petitioners' 1976 income. While it is not clear from the record, it appears that respondent's concession of $ 700,000 pertains to the two $ 500,000 checks issued by LMC for the purchase of cashier's checks to be made payable to petitioner. There remains $ 1,005,842.50, which respondent claims was income to petitioners in 1976. Bruce Waldman, a certified public accountant employed by the U.S. Trustee for the bankruptcy estate of Kings Point, appeared as a witness at trial for petitioner Patricia Laird. He testified that the check issued by LMC to petitioner, dated November 15, 1976, in the amount of $ 87,342.50, was a salary check. The record further shows that this amount was reported as income on petitioners' 1976 return. The amount remaining *604 in issue, therefore, is $ 918,500. Respondent's determinations are presumed to be correct, and petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). There were introduced into evidence at trial copies of each of the checks issued by LMC to petitioner in 1976. Petitioner testified that each of the checks, except for the two $ 500,000 checks made payable to the order of Western Bank of Commerce for cashier's checks payable to petitioner, were loans or advances to him; i.e., that he was a conduit through whom LMC issued checks to various general partnership accounts. He complained that in 1976 LMC issued to him 218 checks in the total amount of $ 23,847,610, and that to require him to remember what the purpose was for the checks submitted to him for his examination at trial was unreasonable. We are not sympathetic toward petitioners' protestations. We are mindful of the U.S. Court of Appeals for the Ninth Circuit's observation in United States v. Crooks, 804 F.2d at 1443, regarding the Cal-Am coal shelter program, that "Laird devised *605 what the government calls a 'check cycle,' but what might better be called a 'check cyclone,' to create canceled checks representing loans and tax deductible payments to be used to sustain the deductions in the event of an audit by the IRS." While a taxpayer's oral testimony may be sufficient to carry his burden of proof in some instances, in a situation such as this, where the testimony is conclusory and subject to doubt, it falls short of overcoming the Commissioner's presumption of correctness. See Hearn v. Commissioner, 36 T.C. 672, 673-674 (1961), affd. 309 F.2d 431 (9th Cir. 1962). As we recently stated in Sacks v. Commissioner, T.C. Memo. 1994-217: "We, therefore, are left with petitioner's uncorroborated self-serving testimony, which this Court need not accept." Petitioner has failed to prove that respondent's determination on this issue is incorrect. We, therefore, sustain respondent's determination on this issue as to the amount of $ 918,500. Issue 3. Petitioners' Income From Cal-Am Financial Corp.
In the statutory notice of deficiency for the year 1976 respondent determined *606 that Mrs. Laird received income of $ 177,608 in 1976 that was not reported on petitioners' 1976 return. At trial, respondent introduced into evidence numerous checks issued to Mrs. Laird by Cal-Am Disbursement Account. Bruce Waldman, to whom we have previously referred, testified that the Cal-Am Disbursement Account was also known as Cal-Am Financial. The Cal-Am Disbursement Account was actually a corporate account for Kings Point. Mr. Waldman testified that the $ 177,608 paid to Mrs. Laird in 1976 from the Cal-Am Disbursement Account was moneys repaid to petitioners for loans previously made by them to Kings Point. While the documentation submitted by Mr. Waldman to support his testimony was somewhat sketchy, we found him to be a disinterested and credible witness. Accordingly, we hold that the $ 177,608 in issue was not income to petitioners in the year 1976. Issue 4. Petitioner Joseph R. Laird's Liability for the Additions to Tax Pursuant to Section 6653(b)
Respondent contends that petitioner Joseph R. Laird's underpayments of income tax for the years in issue are due to fraud. As in effect during the years in issue, section 6653(b) provides for an addition to tax *607 of 50 percent of the amount of an underpayment if any part of the underpayment is due to fraud. Respondent bears the burden of proving, by clear and convincing evidence, that some part of the underpayment is due to fraud and that petitioner had a specific purpose to evade a tax believed by him to be due and owing. Sec. 7454; Rule 142(b); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Kotmair v. Commissioner, 86 T.C. 1253, 1259-1260 (1986); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Because fraud can seldom be established by direct proof of the taxpayer's intention, the taxpayer's entire course of conduct must *608 be considered, and circumstantial evidence may be used to establish fraudulent intent. Spies v. United States, 317 U.S. 492, 499 (1943); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). On their 1976 Federal income tax return, petitioners reported income in the total amount of $ 165,109; $ 150,000 was earned by petitioner as legal fees, and $ 15,109 was reported by Mrs. Laird as net income from her real estate business. The record clearly establishes that these income amounts were properly reported. Respondent contends, and we have found, that petitioner failed to report as income in the year 1976 $ 918,500 received from LMC. As we have previously noted, the existence of fraud is a question of fact to be determined from the entire record. Kotmair v. Commissioner, supra at 1259. Respondent may carry her burden on the basis of reasonable inferences to be drawn from the record, but she may *609 not rely on petitioner's failure to carry his burden of proof as to the underlying deficiencies. See Habersham-Bey v. Commissioner, 78 T.C. 304, 311-312 (1982); Hansen v. Commissioner, T.C. Memo. 1987-149. Respondent failed to further proceed at trial to show by clear and convincing evidence that petitioners intentionally omitted LMC income from their 1976 return. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Drobny v. Commissioner, 86 T.C. 1326 (1986); Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Bert v. Commissioner, T.C. Memo. 1989-503. On petitioners' 1976 joint Federal income tax return, petitioner claimed a loss of $ 8,191,720 allegedly incurred from his participation in various Cal-Am partnerships. He then carried the remainder of the loss ($ 8,026,611) over to petitioners' 1977 joint Federal income tax return. It is clear from this record that petitioner knew when he filed *610 his 1976 and 1977 returns that he was not entitled to the partnership losses he claimed on those returns. Based upon our review of the record before us, we are satisfied that respondent has carried by clear and convincing evidence her burden of proof as to the additions to tax under section 6653(b) with regard to petitioner Joseph R. Laird, Jr. Issue 5. Innocent Spouse Relief
The final issue is whether Mrs. Laird qualifies as an innocent spouse under section 6013(e). Section 6013(d)(3) provides that if a joint return is filed, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. Section 6013(e), [5] however, provides: SEC 6013(e) Spouse Relieved of Liability in Certain Cases. -- (1) In general-. Under regulations prescribed by the Secretary, if (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and *611 (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
The burden is upon the person claiming innocent spouse relief to show that each of the four requirements of section 6013(e) has been satisfied. See Flynn v. Commissioner, 93 T.C. 355 (1989). However, because Congress enacted the innocent spouse provisions to remedy the "grave injustice" that sometimes resulted from joint and several liability, we should not interpret the innocent *612 spouse exception too narrowly. See Bokum v. Commissioner, 992 F.2d 1132, 1134 (11th Cir. 1993), affg. on other grounds 94 T.C. 126 (1990); Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). In other words, the statute is remedial, intended by Congress to benefit taxpayers, and should be so construed. Before 1971, several unjust situations existed that caused some Judges of this Court to suggest that Congress change the law to provide for innocent spouse relief. See, e.g., Scudder v. Commissioner, 48 T.C. 36, 41 (1967), remanded 405 F.2d 222 (6th Cir. 1968), where Judge Hoyt, speaking for the Court, said: Although we have much sympathy for petitioner's unhappy situation and are appalled at the harshness of this result in the instant case, the inflexible statute leaves no room for amelioration. It would seem that only remedial legislation can soften the impact of the rule of strict individual liability for income taxes on the many married women who are unknowingly subjected to its provisions by filing joint returns.
*613 Shortly thereafter Congress accepted our invitation by changing the law to provide for innocent spouse relief. As originally enacted in 1971, the innocent spouse provision applied only if omitted income caused the substantial understatement of income tax. Act of Jan. 12, 1971, Pub. L. 91-679, 84 Stat. 2063 (codified as amended at 26 U.S.C. sec. 6013(e) (1976)). In response to concerns that the innocent spouse provision was not broad enough to protect all spouses who deserved relief, Congress, in 1984, extended innocent spouse protection to substantial understatements of tax caused by any grossly erroneous claim of deduction, credit, or basis. Sec. 6013(e)(2)(B); Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802; Erdahl v. Commissioner, 930 F.2d 585, 589 (8th Cir. 1991), revg. and remanding T.C. Memo. 1990-101. A. Lack of Knowledge Requirement
Respondent concedes that the first and second requirements of section 6013(e) have been satisfied. But respondent argues that Mrs. Laird has not satisfied the third and fourth requirements. To the contrary, *614 Mrs. Laird contends that when she signed the 1976 and 1977 joint Federal income tax returns, she did not know, and had no reason to know, that there was a substantial understatement of tax on each of the returns. She further contends that it would be inequitable to hold her liable for the 1976 and 1977 tax deficiencies. Although Mrs. Laird inquired about petitioner's tax shelter programs, he told her nothing because, in his opinion, "she was not qualified either by education or by her emotions to understand anything about the complexity of the tax shelter programs in which I was involved." He testified that he did not discuss his business matters with Mrs. Laird because it led immediately to argument. Because petitioner was intolerant and dismissive when Mrs. Laird asked any questions about his business affairs, she did not want to provoke any arguments about business transactions she did not understand. When it came time to file their Federal income tax returns, petitioner ordered Mrs. Laird to sign them, and she did so after being assured they were correct, and had previously been approved and signed by his certified public accountant. Mrs. Laird similarly testified, with specific *615 reference to petitioners' 1976 return, that petitioner confronted her with their 1976 return while she was at the breakfast table and ordered her to sign it. Feeling rushed, and somewhat coerced and intimidated, Mrs. Laird did not review any portion of the return because she knew she would not understand its contents. [6] *616 Because of her limited education and experience, she relied upon petitioner, a tax attorney, to properly complete the returns. [7] Mrs. Laird had no choice but to put all of her faith in petitioner that all of the information on the returns would be correctly reported. Petitioner's superior education and training, aided and abetted by the C.P.A. return preparer, justified her reliance. The situation regarding petitioner and Mrs. Laird's 1977 Federal income tax return was similar to her experience regarding their 1976 return. Both petitioner and Mrs. Laird, who have been at odds since 1980, testified that there was little communication about petitioner's business enterprises and that Mrs. Laird was not permitted to interfere with or question his activities. It is clear that petitioner and Mrs. Laird agree as to his dominance over her with respect to finances, including the filing of income tax returns. While a spouse cannot close her eyes to unusual or lavish expenditures, she is not required to have perfect knowledge of family financial matters. Mysse v. Commissioner, 57 T.C. 680, 699 (1972). Mrs. Laird had no reason to suspect any errors on the Federal income tax returns because her husband's specialty was tax law, and she had no indication that understatements were *617 made. Obviously Mrs. Laird did not know what was reported on the Federal income tax returns for 1976 and 1977. Thus, the only question is whether she "had reason to know" what they contained. The standard generally applied in determining whether a taxpayer "had reason to know" is whether a reasonably prudent person with knowledge of the facts possessed by the person claiming innocent spouse relief should have been alerted to the possibility of a substantial understatement. Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310; Sanders v. United States, 509 F.2d at 166-167. Significant factors in determining whether a spouse had reason to know of an understatement to tax include: (1) The spouse's level of education and her business knowledge and experience; (2) participation in business affairs or bookkeeping by the alleged innocent spouse; (3) the "guilty" spouse's openness concerning the couple's income and business transactions; (4) the presence of unusual or lavish expenditures; and (5) whether the couple's standard of living improved *618 significantly during the years in issue. Flynn v. Commissioner, 93 T.C. at 365-366 and cases cited thereat. The application of these criteria to the facts of this case leads us to the conclusion that Mrs. Laird did not know, and had no reason to know, of petitioner's substantial omission of income he received from LMC in 1976; and that he was not entitled to the enormous loss he claimed on his Schedule C attached to the 1976 Federal income tax return, the remainder of which was carried over to the 1977 return. First, Mrs. Laird was a high school graduate, a housewife for several years, and a person of limited business education and experience. Second, she did not participate to any extent in petitioner's business affairs or intricate tax shelter transactions. Petitioner successfully obfuscated his various business transactions so that hundreds of knowledgeable investors lost millions by their investments in his complex tax shelter programs. It is therefore not surprising that Mrs. Laird was also "kept in the dark" about petitioner's business affairs. When she asked about them, she was told that she would not understand them. Consequently, she *619 was compelled to rely on her husband, the tax shelter promoter and a tax attorney. See, e.g., Perry v. Commissioner, T.C. Memo. 1992-258; Bell v. Commissioner, T.C. Memo. 1989-107. In fact, petitioner also kept control of the household budget. Third, petitioner refused to discuss his business and financial matters with Mrs. Laird. Fourth, there is no evidence that family expenditures were unusual or extravagant in 1976 and 1977. And, fifth, there is no evidence that the standard of living of petitioner and Mrs. Laird improved during the years in question. The Tax Court, while not always consistent in its rationale, has established no bright-line rule or specific safe harbor for lack of knowledge in deduction cases. Oftentimes we have shown considerable leeway in granting innocent spouse relief. See, e.g., Boyle v. Commissioner, T.C. Memo. 1994-438; Thomason v. Commissioner, T.C. Memo. 1994-418; McRae v. Commissioner, T.C. Memo. 1988-374; Shapiro v. Commissioner, T.C. Memo. 1988-350; Bouskos v. Commissioner, T.C. Memo. 1987-574. *620 On the other hand, when we have shown rigidity in suppressing the equitable quality of this relief statute, we have been reversed. See, e.g., Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989), revg. an Oral Opinion of this Court; Erdahl v. Commissioner, 930 F.2d 585 (8th Cir. 1991), revg. and remanding T.C. Memo. 1990-101; Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994), revg. T.C. Memo. 1991-463. We think the facts of this case closely parallel, and fall within the parameters of, those in Price v. Commissioner, supra, and Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990), affg. T.C. Memo. 1987-522, issued by the Court of Appeals for the Ninth Circuit, the circuit to which an appeal herein would be taken. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971); Bokum v. Commissioner, 94 T.C. at 151. Therefore, we will *621 follow the Price and Guth decisions of the Court of Appeals for the Ninth Circuit in this case. In the Price case, Patricia Price worked as a branch manager for a car pooling agency. Her husband, Charles, a stockbroker, acquired shares in a foreign gold mining operation. On their 1980 Federal income tax return, a $ 90,000 deduction was claimed as a result of the mining investment. She questioned the deduction as being "a bit much", but she received assurances from her husband regarding its correctness. We denied Mrs. Price innocent spouse relief. The Court of Appeals for the Ninth Circuit reversed, and stated in a lengthy, explanatory footnote that it would not follow our standard in deduction cases because we had superimposed the standard developed in omission cases onto deduction cases (i.e., knowledge of the transaction which gives rise to an income omission is sufficient to deny relief). To do so, the Court of Appeals said, "would for the most part wipe out innocent spouse protection" in deduction cases. Price v. Commissioner, supra at 963 n.9. In holding that Patricia had no reason to know of the substantial understatement, *622 the Court of Appeals stated, id. at 965-966: In applying these factors, we note that Patricia had limited involvement in the financial affairs of her marriage with Charles in general and none whatsoever in the CCM investment in particular. See Mysse v. Commissioner, 57 T.C. 680 (1972). Indeed, Charles held a separate checking account for his investments, while Patricia's participation in the couple's money matters apparently was limited to paying household expenses and the mortgage on their home. See Hinds, T.C.M. 1988-426. Further, the Commissioner points to no unusually lavish expenditures the couple made during this time period when compared to their past levels of income, standard of living, and spending patterns. Finally, the record indicates Charles took advantage of Patricia's lack of understanding of their financial affairs and misled her. Given these facts, we conclude that a reasonably prudent person in Patricia's position at the time she signed the return could not be expected to know that the return contained a substantial understatement. * * * [Fn. ref. omitted.] * * * We agree with the Commissioner *623 that the size of the deduction ($ 90,000) viz-a-viz the total Income reported on the return (just more than $ 100,000), when considered in light of the fact that Patricia knew of the existence of the CCM investment and its rather unusual nature (Colombia gold mining), was enough to put Patricia on notice. We disagree with the Commissioner, however, in his insistence that Patricia did not satisfy the resultant duty to inquire. Patricia did not ignore the deduction, but instead questioned Charles about it. We therefore distinguish this case from one in which the tax court denied relief to a spouse seeking relief who simply ignored a large deduction and who refused to make inquiries. Levin, 53 T.C.M. at 8. In addition, Patricia agreed to sign the return only after Charles had assured her that a putatively reputable CPA had prepared it. See Killian, 53 T.C.M. at 1441 (spouse "took reasonable steps to determine the accuracy of the return" in agreeing to sign return only after having questioned husband about sham loss claimed on return and having received assurances that loss was due to investment that had been recommended *624 by CPA who prepared return). Thus, especially given her relative lack of experience in and understanding of financial affairs, see Mysse, 57 T.C. 680; Hinds, T.C.M. 1988-426, we conclude that Patricia satisfied her duty of inquiry.
In Guth v. Commissioner, supra, Arlys Guth (Arlys) and James Guth (James) filed joint Federal income tax returns for the years 1979 to 1981. Arlys had married James in 1977. They were separated in 1982 and divorced in 1983. During their marriage James controlled the family finances, paid the bills, and prepared their Federal income tax returns. Shortly after their marriage, James became involved with the Universal Life Church. He formed his own congregation, the Carlmont ULC, and named himself pastor. Although James appointed Arlys treasurer of the church, her involvement with church activities was minimal. As treasurer, she signed checks which James prepared and presented to her for signature. On the returns that he prepared for the years in issue, James deducted as charitable contributions amounts which were actually expended for personal reasons and, therefore, nondeductible under section 262. The *625 Commissioner determined deficiencies in their Federal income taxes and additions to tax for the years in issue by disallowing the claimed charitable contribution deductions to the Carlmont ULC. The Guths conceded the deficiencies and additions to tax. Arlys, however, maintained that she was an "innocent spouse" and, thus, not liable for those deficiencies and additions determined by the Commissioner. This Court found that Arlys did not know that James' involvement with Carlmont ULC derived from anything but his desire to begin a church that accorded with his own religious beliefs. In view of Arlys' testimony, we found that she was unaware that James established Carlmont ULC for tax reasons. In finding that Arlys had no reason to know of the circumstances which gave rise to the substantial understatements, we stated: Arlys' involvement in the couple's financial matters was extremely limited. James controlled all of the couple's financial activities, including the maintenance of the checking account and preparation of the income tax returns. Arlys' involvement was limited to turning her W-2 forms and paychecks over to James, and signing checks and income tax returns under *626 James' direction. James made no attempt to explain the income tax returns to Arlys or the purpose of the checks that he told Arlys to sign. In fact, James was careful to keep his true motivations for his involvement with Carlmont ULC from Arlys, masking his desire for financial gain in professed religious concerns. We conclude, therefore, that as a reasonable person with limited involvement in financial matters, Arlys did not know of, nor should she have known of, the substantial understatements contained in the returns.
Guth v. Commissioner, T.C. Memo. 1987-522. In affirming our decision, the Court of Appeals for the Ninth Circuit stated in Guth v. Commissioner, 897 F.2d at 444-445, as follows: The Tax Court made factual findings that Arlys Guth had limited knowledge of financial matters, and was only tangentially involved in family finances. The court noted that her husband James had hidden from Arlys his true motivation for founding a church. He deliberately led her to believe that he operated out of religious belief. Noting Arlys's limited education and sense of duty to her husband, the Tax Court felt *627 Arlys was justified in not doubting her husband in this regard. There was no evidence of lavish or unusual expenditures that would have given her reason to know that something was financially amiss.
Like Patricia Price and Arlys Guth, what else could Mrs. Laird have done in these circumstances? When she asked petitioner about his complex business transactions, he rejected her inquiries and told her she would not be able to comprehend them. When it came time to file their income tax returns, he demanded that she sign them and assured her that they were correct. She acquiesced and signed. In sum, we find the pertinent facts in this case virtually indistinguishable from those in Price and Guth. We therefore sustain Mrs. Laird's position that she did not know, or have reason to know, of petitioner's omitted income or the loss deductions claimed on the tax returns. B. Inequitable To Hold Mrs. Laird Liable
In assessing the equity in holding a spouse liable, we consider: (1) Whether the spouse claiming relief significantly benefited from the grossly erroneous items attributable to the culpable spouse, Estate of Krock v. Commissioner, 93 T.C. 673, 677 (1989); *628 (2) whether the spouse claiming relief has been deserted by or divorced or separated from the culpable spouse, sec. 1.6013-5(b), Income Tax Regs.; and (3) probable future hardships that would be visited upon the purportedly innocent spouse if she is not relieved from liability, Sanders v. United States, 509 F.2d at 171 n.16; Dakil v. United States, 496 F.2d 431 (10th Cir. 1974). Here it is clear that Mrs. Laird did not significantly benefit from the grossly erroneous items attributable to petitioner; that she has been divorced from petitioner for several years; that she must provide her own support from her modest income; and that future hardship will be visited upon her if she is not relieved from liability. Mrs. Laird did not benefit above and beyond the standard of support to which she had become accustomed. Her standard of living has actually fallen in later years. Despite the spousal support award by the Superior Court of the State of California for the County of Los Angeles in the amount of $ 2,500 per month, Mrs. Laird has received no support payments from petitioner because his assets were placed in a State *629 court receivership and he filed for bankruptcy. This series of events illustrates that Mrs. Laird's lifestyle or standard of living was in fact adversely affected as a result of petitioner's actions. See, e.g., Belk v. Commissioner, 93 T.C. 434, 440 (1989). She has been forced to support herself because all of the possible proceeds from petitioner's business operations are in the hands of others. We therefore find that no significant benefit inured to Mrs. Laird as a result of the understatements. See, e.g., Perry v. Commissioner, T.C. Memo. 1992-258. Moreover, it appears that petitioner's present financial condition is so poor that virtually none of the Federal taxes can be collected from him personally. It would be inequitable to collect the tax deficiencies from Mrs. Laird when she did not profit from the transactions. At present her prime earning years are over, and she has no form of pension other than Social Security benefits. She has only a modest source of income from her job and the residence in which she lives. In these circumstances we think she should not be held liable for petitioner's debts. Based *630 on this record, we conclude that it would be inequitable to hold Mrs. Laird liable for the deficiencies in issue. Where, as here, Congress has indicated that it had a heart by providing equitable relief for innocent spouses trapped by the business and financial shenanigans of guilty spouses, we see no reason why we should try to make that heart beat feebly. Accordingly, we hold that Mrs. Laird qualifies as an innocent spouse under section 6013(e). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded $ 700,000 of this adjustment.↩
3. Petitioner Patricia J. Laird filed a Motion for Leave to Amend Petition on Mar. 9, 1992, requesting innocent spouse relief. We will grant this motion and substantively address the issue later in this Memorandum Opinion.↩
4. We note that Mrs. Laird provided petitioner with information relating to her real estate income and expenses. Those items were included on her Schedules C. It was her impression that he would correctly report such information on the returns.↩
5. The Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, amended sec. 6013(e)↩ retroactively to all years to which the Internal Revenue Code of 1954 applies.
6. On direct examination, Mrs. Laird was questioned as follows: Q: * * * why you would have signed this without reviewing it. Can you explain that for the -- A. Well, because first of all, I don't understand it. Secondly, there was no time to look at it and I -- my husband said to sign it and we need it right away. Q: Do you understand that signature is under penalty of perjury; what were you relying on? A: I was relying on my husband, of course. He's a tax lawyer. He said to sign it and I signed it.↩
7. Petitioner testified that he discussed the tax returns with his wife only "to an extremely limited extent; only with the idea of having her sign them without too much delay."↩